# CHARLESTON.

## STURM v. CHALFANT.

Submitted June 16, 1893.—Decided November 18, 1893.

1. FRAUDULENT CONVEYANCES.

J. C., an insolvent debtor, against whom litigation has been pending for years in the name of A. P. Sturm and others, being aware that an account is pending before a commissioner to ascertain the rents and profits due from said J. C. to said Sturm for a certain tract of land for which he is claiming a decree against said J. C., and on the day after said commissioner's report was returned and filed in the clerk's office, finding that over four thousand dollars was due from said J. C. to said Sturm, said J. C. acknowledges and delivers for record a deed for one hundred and twenty seven acres of land to his son-in-law, in trust for a weak-minded son, which deed is dated nearly two years anterior to its acknowledgment and delivery for record, and leaves the grantor with insufficient means to pay his indebtedness, which deed purports to have been made in consideration of four thousand dollars cash in hand, but which the evidence shows was made in consideration of an account claimed by said son against his father for work done on the farm, which was barred by the statute of limitations, and for the proceeds of cattle and sheep sold by said son at a time when the evidence fails to show he owned such stock. and it appears that several of the items charged in said account, which is claimed to have been made out at the date of the deed in 1884, did not accrue, if they ever did, until some time thereafter, and when it is shown by the testimony of the wife of said son, that he had no means with which to make the payment of the purchase-money, and by other witnesses, that he declared that his only means of paying for the land was out of the timber, which had been expressly reserved in the deed by the grantor for

the use of the farm, and by said son's own frequent declarations that, if he had six hundred dollars out of the land which he had put into it, the land might go, these circumstances clearly indicate that the pretended consideration was fraudulent, and that said conveyance was made with intent to hinder, delay and defraud the plaintiff, Sturm.

2. FRAUDULENT CONVEYANCE

Fraud may be deduced from deceptive assertions, and from incidents and circumstances evincing a fraudulent intent.

3 FRAUDULENT CONVEYANCE.

Fraud is to be legally inferred from the facts and circumstances of the case, when those facts and circumstances are of such a character as to lead a reasonable man to the conclusion that the conveyance was made with intent to hinder, delay and defraud existing or future creditors.

4. FRAUDULENT CONVEYANCE.

The fact that the account for labor sought to be charged as a part of the consideration for the tract of land was barred by the statute of limitations at the date of the deed is a circumstance which may be weighed in determining the *bona fides* of the transaction.

B. WILSON, J. P. CLIFFORD and M. G. SPERRY for appellant, cited 4 W. Va. 56; 23 W. Va. 639; Code, c. 74, s. 1; Fonb. Eq. (3d. Ed ) 277.

JOHN BASSEL, for appellee cited 24 W. Va. 405; 29 W. Va. 441; 31 W. Va. 137.

ENGLISH, PRESIDENT:

On the first Monday in April, 1890, Asbury P. Sturm filed his bill in equity in the Circuit Court of Harrison county against John Chalfant, Jeremiah M. Chalfant and Melville B. Bartlett, trustee, in which he alleged that on the 1st day of October, 1886, he obtained a judgment or decree in said court in the case of himself against Soloman S. Fleming, John Chalfant, and others, against said John Chalfant for the sum of four thousand and eighty three dollars and sixteen cents, with interest thereon from said date and costs;—that said sum was adjudged to him against said Chalfant on account of rents of two certain tracts of land of complainant held by said Chalfant from the year 1865 to the year 1885 inclusive, the suit in which said decree was rendered having been instituted by complainant

in the year 1873;—that no part of said decree has been paid by said Chalfant or by any one for him, the whole thereof remaining unsatisfed;—that said Chalfant was insolvent and had no other property than that therein mentioned to which complainant could resort for satisfaction of said decree;—that on the 1st day of April, 1884, said John Chalfant, by deed of that date, conveyed to one Melville B. Bartlett,who was then and still is the son-in-law of said Chalfant, a tract of land containing one hundred and twenty seven acres lying on the waters of Robinson's run in said county in trust for the use and benefit of Jeremiah M. Chalfant, a son of said grantor, which conveyance was made by said John Chalfant with the intent on his part, and with the like intent upon the part of said Melville B. Bartlett and Jeremiah M. Chalfant, to hinder, delay, and defraud the creditors of said John Chalfant, and especially the plaintiff;—that while said deed upon its face recites that it was made in consideration of the sum of four thousand dollars in hand paid by said Jeremiah, it was utterly untrue, and that nothing was paid by him, for the reason that he had no money or means wherewith to make such a purchase;—that said conveyance was wholly without consideration deemed valuable in law and was made on the part of said John Chalfant and Jeremiah M. Chalfant to hinder, delay and defraud the creditors of said John;— and he prayed that said deed might be canceled as to the plaintiff's decree, and said land be sold to satisfy the same.

The defendant Jeremiah M. Chalfant appeared at rules and demurred to the plaintiff's bill, and on the 27th day of May, 1890, said demurrer was considered by the court and overruled, and thereupon the defendant, Jeremiah M. Chalfant, filed his separate answer to the plaintiff's bill, putting in issue the material allegations of plaintiff's bill, denying that in the purchase of the one hundred and twenty seven-acre tract of land in the bill mentioned there was any intent on his part, or on the part of any one connected with the transaction, to hinder, delay or defraud any creditor of said John Chalfant, and claiming that there was no intent to hinder, delay and defraud the plaintiff in the collection of his said decree. He also alleged that he paid

to John Chalfant a full and adequate consideration for said land, amounting in the aggregate to four thousand dollars at least, as recited in said deed, which amount he claims he had been accumulating since he was twenty one years of age. He also denied that he had any knowledge of any such intent on the part of any of his co-defendants.

The bill was taken for confessed as to the defendants John Chalfant and Melville B. Bartlett, trustee. Depositions were taken and filed by both plaintiff and defendants, and on the 28th day of January, 1892, a decree was rendered in the cause, holding the deed made by the defendant John Chalfant to said Bartlett as trustee for Jeremiah M. Chalfant, dated April 1, 1884, fraudulent as to the decree of the plaintiff against the said John Chalfant for four thousand eighty three dollars and sixteen cents, with interest from October 1, 1886; and it was decreed, that as to said debt the said deed be set aside and annulled, and directed that, unless the said debt was paid to the plaintiff in thirty days, a commissioner thereby appointed should advertise and sell said one hundred and twenty seven acre-tract of land upon the terms therein prescribed; and from this decree the said Jeremiah M. Chalfant applied for and obtained this appeal.

The action of the Circuit Court in holding said deed of conveyance from John Chalfant to M. B. Bartlett, trustee, for Jeremiah M. Chalfant, to be fraudulent, and setting the same aside and decreeing it to be sold in satisfaction of plaintiff's decree, is assigned as error.

Now, in order that we may seek satisfactorily the intent which actuated the defendant John Chalfant in making this conveyance, it is necessary that we should inquire into the business relations which existed between the parties anterior to the transaction, and to the circumstances which surrounded them about the time the conveyance was made.

The allegation that the defendant John Chalfant was insolvent, and had no property other than the said one hundred and twenty seven acres of land, is taken for confessed as to the defendants John Chalfant and M. B. Bartlett, and is not denied by Jeremiah M. Chalfant in his answer.

When we look to the pleadings and exhibits filed therewith, it is apparent that the litigation between the plaintiff and defendant, which resulted in the decree sought to be enforced in this case against the land conveyed as above stated by John Chalfant, is not of recent origin. It appears that during the war, and while said Sturm was beyond the lines, judgments were rendered against him, and his lands were decreed to be sold in satisfaction thereof, and at the sales of said lands by special commissioners said John Chalfant became the purchaser, and remained in possession thereof for many years; and that on the 25th day of January, 1885, in the chancery cause of *Sturm* v. *Fleming et al.*, a decree was rendered declaring void as to the plaintiff said judgments, and also the decrees under which said lands were sold, restoring said Sturm to the possession of said lands, and directing a commissioner to ascertain and report what amount, if any, had been paid upon said judgments out of the proceeds of the tract of land sold under the decree of said court in the case of Lucas against the plaintiff Sturm and others, together with any other matters that said commissioner might deem pertinent, or that might be required by the parties thereto.

On the 4th day of January, 1886, said commissioner returned and filed in the clerk's office his report in pursuance of said decree, in which he ascertains, among other things, the amount due A. P. Sturm from John Chalfant to be four thousand one hundred and fifty seven dollars and eight cents; and when we refer to the deed made by John Chalfant to Melville B. Bartlett, trustee, for the use of the defendant Jeremiah M. Chalfant, a copy of which is filed with the defendant's answer, it appears that although said deed bears date on the 1st day of April, 1884, it was not acknowledged and admitted to record until the 5th day of January, 1886, the next day after said commissioner's report was returned and filed in the clerk's office. The said John Chalfant, in his answer to plaintiff's bill, claims that he considered it impossible that rents and profits could be recovered in that suit without a specific claim being made therefor, and that the result reached by the commissioner could not be reasonably anticipated by said John Chalfant.

Be this, however, as it may, the result had been reached by the commissioner, and more than four thousand dollars had been ascertained to be due from said John Chalfant to A. P. Sturm. The report had been filed in the clerk's office, and said Chalfant, being a party to the suit, actively engaged in its defence, had the opportunity of knowing, and it must be presumed did know, the result of said commissioner's investigations before he acknowledged said deed on the 5th day of January, 1886, to his son-in-law Melville B. Bartlett, trustee, for his son Jeremiah M. Chalfant.

The claim that said John Chalfant could not reasonably expect the result reached by the commissioner is sought to be supported by the fact that there was no specific prayer, in the petition for the opening and rehearing of said decree, that the rents, issues and profits of the tract of land sold under said former decsee might be ascertained, and that the plaintiff might recover the amount when so ascertained from the said John Chalfant; but when we look to the concluding portion of said petition we find that said A. P. Sturm prayed that the decrees therein made and complained of might be set aside and reversed, and that restitution of said property or of the proceeds of the sale thereof be made, and for such other further and general relief as the nature of his cause required, and as to equity appertained, *etc.* And while said John Chalfant himself might not have known what results might have been reached under that and under a decree subsequently rendered in the cause in pursuance thereof, which, among other things, directed the commissioner to ascertain and report any other matters that the said commissioner might deem pertinent or that might be required by the parties thereto, yet the eminent counsel who represented him knew that in the case of *Humphrey* v. *Foster,* 13 Gratt. 653, the court of appeals of Virginia held that "on a bill claiming a share of a tract of land, and asking for a partition and for general relief, the plaintiff's right to partition being established under the prayer for general relief, there may be a decree for an account of rents and profits;" and in the case of *Pickens's Ex'rs* v. *Kniseley,* 36 W. Va. 794 (15 S. E. Rep. 997) this Court has

recently announced the same doctrine by holding that the general rule is that if the facts be contained in the bill, though the specific relief asked for be refused, the proper relief which the facts call for under the law may be given under the prayer for general relief.

In searching, however, for the motive that actuated said John Chalfant, it is sufficient to notice the fact that the result was reached by the commissioner which charged him with an indebtedness to A. P. Sturm of over four thousand dollars, and it is a coincidence which should have peculiar weight in determining the question presented for our consideration in this case, that on the day following, said Chalfant should convey this valuable tract of land to his son-in-law in trust for his weak-minded son, leaving himself utterly insolvent; and, although he had other lands Solomon Chalfant states in his testimony they were insufficient to pay his debts.

In determining the *bona fides* of this conveyance, let us next look to the testimony, and see whether the purchase-money was paid by said Jeremiah Chalfant in the manner he states it was "in stock, in work, in money, like any other man would." The appellant, Jeremiah Chalfant, arrived at his majority in 1872. On the 12th day of March, 1879, he was married, and, according to the testimony of Solomon Chalfant, said Jeremiah moved by himself, and kept house and was doing business for himself. This statement of facts, if it be taken as true, left but seven years in which said Jeremiah Chalfant, by his labor at twenty dollars per month, was to accumulate the sum of three thousand one hundred and sixty two dollars and seventy seven cents, the item charged in the account of said Jeremiah against said John Chalfant. Now, if it be conceded that he worked constantly for seven years at twenty dollars per month, it is not reasonable to suppose that after deducting his expenses he saved more than half that sum, or ten dollars *per* month, or one hundred and twenty dollars *per annum*, which with interest added beginning with the end of each year until he ceased to labor, and then on the aggregate for five years, would only amount to about one thousand three hundred dollars; and the fact, that this ac-

count for labor was barred by the statute of limitations in 1884, when the deed is dated, may be weighed as a circumstance indicative of fraud in determining the *bona fides* of the transaction.

When we look at the other items of the account, and examine the proof, it appears exceedingly indefinite. Solomon Chalfant says the first item is a cow and three heifers, ninety dollars and fifty five cents. "I know that he had that stock, and that my father got them; how, or for what consideration, he does not state. As to the next item, three three year old steers, one hundred and twelve dollars and fifty cents, the same witness says, "I know father got the proceeds of these cattle;" and he makes the same statement as to one yearling steer, twenty dollars; one heifer, twenty five dollars and twenty five cents; one lot of sheep, sixty eight dollars and seventy five cents; one lot of cattle, one hundred and three dollars; one lot of sheep seventy five dollars. Now all of these statements must be considered in connection with the fact that said Jeremiah Chalfant was living on his father's farm, and laboring for him by the day or month and are not inconsistent with the fact that the stock spoken of was raised on the farm, and that John Chalfant was of right entitled to the proceeds. It is true, David Slocum, the father-in-law of said Jeremiah, states that said Jeremiah paid him two hundred and twenty five dollars for his father, John Chalfant, which was in the shape of a note on said John Chalfant; but the same witness, when asked, "Have you any reason to believe that Jeremiah M. Chalfant had any money of amount to pay on land at all?" answered, "I don't think he had any considerable amount. I am pretty sure that he had not. I give this as my opinion." The same witness states that before this deed was made he went and looked at the land, and said John Chalfant proposed that, if he would buy half of the land for his daughter (Jeremiah's wife) he would give the other half to said Jeremiah; that said John gave an option to some one on the coal underlying it which defeated the trade; and said Slocum further states that about the time he was talking about trading for the land (and this was after Jeremiah's

marriage with his daughter) he heard Jeremiah say that his father owed him about six hundred dollars for the work he had done, and heard him say that frequently.

In connection with this testimony, when we turn to the testimony of Annette Chalfant (the wife of said Jeremiah) when asked to state what money or property said Jeremiah had at the time of their marriage, answered: "So far as money was concerned, he had none that I know of. He had two horses; he claimed two horses. After we were married awhile, his father gave him a cow. The other household goods we had to commence housekeeping were given me by my father, David Slocum, except a little that Sol Chalfant let my husband have." She also stated that said Jeremiah paid some money on said land, but he did not pay any four thousand dollars;—all the money they had when they moved from Robinson's run onto the land was about fived hundred dollars;—that they had considerable expenses for work and other things on the land, and she did not know just how much he did pay, but it was somewhere between two and six hundred dollars;—she did not think the amount paid on the land exceeded six hundred dollars *etc.*; that she heard her husband say that after he was twenty one years of age he went to visit relations in Pennsylvania, and remained with them some time—she thought a year or two. She further states that after they moved upon said one hundred and twenty seven acre-tract he laid up no money; that he did not make more than his expenses; that his property was levied on for about sixty dollars of taxes, and she had heard him say aften that, if he had the four, five or six hundred dollars he had in the land out of it, the land might go. In answer to the second question asked the witness Barton Drummond, he states that Jeremiah told him he had five or six hundred dollars in said land, and, if he had it out, the land might go. Again the witness James B. Fowler states that he had a conversation with said Jeremiah in reference to removing the timber from the one hundred and twenty seven acre-tract of land, in which said Jeremiah told him that what he was to get for the timber was to help pay for the land, and that he expected to pay for the land from the

profits on what he could get off of it. In that connection he understood Mr. Chalfant to say he had not paid a dollar on it; that his father-in-law was to pay about one half of it—and in the conversation he asked witness whether Mr. Sturm could sell his land, and informed him that Mr. Sturm was proceeding against his father to recover judgment. And again the witness C. L. Crile stated, in answer to question 5, that said Jeremiah Chalfant told him that if he had the money out that he had paid into the place it might go; and, in answer to the sixth question, that he told him at the time he came there he had put six hundred dollars in it and his own work, and had paid some little more on it. Samson Harbert also testifies that he heard said Jeremiah Chalfant say to Melville Bartlett, "You know damn well I can't pay for the land unless I sell the timber," when said Bartlett had forbidden him from cutting the timber on the land.

Now, the question is whether these statements and admissions made by said Jeremiah Chalfant as to the amount he had paid on said tract of land can be reconciled with the statement made by him in answer to the second question asked him, as to whether he paid the consideration of four thousand dollars recited in the deed for said land, where he says "I did pay the four thousand dollars. I paid it in stock, in work, in money, like any other man would"— and he filed with his answer a statement of the items showing how it had been paid. Among those items is found a judgment of C. J. Lang against John Chalfant, which Solomon H. Chalfant had at some time paid for John Chalfant, when it does not appear. At the foot of said account a memorandum is found, as follows: "Settled by deed for one hundred and twenty seven acres of land dated April 1, 1884;" and a copy of a note which reads as follows:

"Mannington, West Va., April 1, 1884. One thousand three hundred and four dollars and seventy eight cents. One, two, three, and four —— after date, in equal payments, I promise to pay to the order of S. H. Chalfant thirteen hundred and four seventy eight hundredths dollars, with interest at six per cent. Value received. Negotia-

33

ble and payable at the —— Bank of ——, W. Va. No. 172. Due ——. [Signed] J. M. Chalfant."

Now, although said account was made up and purports to have been settled as of April 1, 1884, by a deed of that date for said one hundred and twenty seven acres of land, yet Solomon H. Chalfant, in answer to the fourth question, testifies that he did not intend to say that account showed the items at the 1st of April, 1884, but that it showed the items of account about the time the deed was made, because he knew that part of said account was paid after the 1st day of April, 1884. Which of said items were so paid he does not state, but it is apparent that on the 1st of April, 1884, an account was made up of items, a portion of which had never been paid, for the purpose of showing a fraudulent consideration for said one hundred and twenty seven acre-tract of land; and it is just as apparent that on the 5th day of January, 1886, this same false account was used in pretended settlement for the purchase money of said land.

As to the C. J. Lang judgment, which forms one of the principal items of said account, it is difficult to reconcile the statement of Jeremiah Chalfant, when asked how he came to owe S. H. Chalfant, for said judgment, when he says: "I borrowed it; I borrowed the money of him;" and again, in answer to the seventeenth question on cross-examination, in speaking of said Lang judgment, he replies: "I borrowed the money to pay that of my brother S. H. Chalfant, and gave him my note for it when I paid for this land, when I took possession;" and in answer to the next question he states that he got the money before he got the deed for said tract of land—with the fact that the note above copied, which was exhibited with said Jeremiah Chalfant's deposition, for one thousand three hundred and four dollars and seventy eight cents, the exact amount of the Lang judgment, was executed on April 1, 1884, to S. H. Chalfant, and when it appears from the statement of Solomon H. Chalfant, made in answer to question 27, that the last of said judgment, as he was inclined to think, was paid by witness in 1881, at John Gifford's sale on Mudlick; and, if this be true, it can not be true, as stated

by Jeremiah Chalfant, that he borrowed the money from his brother S. H. Chalfant, and paid it to C. J. Lang, or that he borrowed the money to pay said judgment within two or three months before the 1st of April, 1884, the date of the deed.

It is apparent, then, that no part of said Lang judgment was paid by Jeremiah M. Chalfant, and while it may be regarded as a brotherly act on the part of said S. H. Chalfant, some three or four years after he paid said judgment for his father (under what arrangement for reimbursement does not appear), that he should hand over this judgment to his brother Jeremiah with its accrued interest, to enable him to pay the purchase-money for this tract of land the next day after the commissioner had ascertained a liability in favor of A P. Sturm, yet it can not be regarded as honest, fair dealing with the creditor of John Chalfant, when taken in connection with the surrounding circumstances, and the repeated declarations of said Jeremiah that he only had about six hundred dollars in the land, and if he had that out it might go, and his further declaration that his only means of paying for the land was the sale of the timber. We can but regard this account, or the principal part of it, to have been manufactured for the occasion by his ingenious brother, S. H. Chalfant, with intent to hinder, delay and defraud said A. P. Sturm, a creditor of said John Chalfant, and to assist said John Chalfant in committing a fraud against said A. P. Sturm by making said conveyance to said trustee.

The circumstances above detailed, and the question asked the witness J. B. Fowler as to whether A. P. Sturm could sell his land, and his statement to said Fowler that said Sturm was proceeding against his father to obtain a judgment, shows clearly that he had notice of, and was seeking to avoid, the Sturm debt. It is held by this Court in the case of *Core v. Cunningham*, 27 W. Va. 206, that, "where the facts and circumstances connected with a fraudulent conveyance necessarily establish complicity of the grantee in the fraudulent intent, it is not necessary by direct proof to show notice of such intent to the grantee."

In the case of *Lockhard* v. *Beckley*, 10 W. Va. 88 (point 9

of the syllabus) this Court held that "fraud is to be legally inferred from the facts and circumstances of the case, when those facts and circumstances are of such a character as to lead a reasonable man to the conclusion that the conveyance was made with the intent to hinder, delay, or defraud existing or future creditors." So, also, in *Goshorn* v. *Snodgrass*, 17 W. Va. 717, this Court held that "the proposition that 'fraud must be proved and not presumed' is to be understood as only affirming that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence, positive or circumstantial;" and also in the same case: "Fraud may be deduced from deceptive assertions, and from incidents and circumstances evincing a fraudulent intent." See, also, *Knight* v. *Capito*, 23 W. Va. 639, in which case this Court held that "if an insolvent grantor, who is justly indebted to a creditor in a small amount, convey to him all his property, or the greater portion thereof, in satisfaction of his debt, for a nominal consideration falsely recited in the deed, and claimed by the grantee to have been in hand paid, equal in value to that of the property conveyed, but largely in excess of the debt actually due such creditor, and he accept the same, such deed is void as to the other creditors of the grantor."

Now, when we apply these principles to the discordant and utterly irreconcilable statements made by the parties most intimately connected with the transactions, and take into consideration the near relationship of said parties, the effort to place considerable items in the account of Jeremiah Chalfant against his father in 1884, which S. H. Chalfant, who made out the account, admits did not exist until long afterwards, and combine these facts with the further fact that the Circuit Court, which was near to, and perhaps well acquainted with, the witnesses who testified and the parties to the transaction, has found that said deed was fraudulent as to the decree of plaintiff, A. P. Sturm, and when we further consider the manifest difficulty the evidence presents on its face to a reconciliation with honesty and fair dealing on the part of those concerned in the transactions complained of, we must conclude that the de-

cree complained of was not erroneous in holding, as it did, said deed fraudulent as to the plaintiff's decree.

The decree complained of is therefore affirmed, with costs.