# CHARLESTON.

BANK *v.* PRAGER & SON *et als.*

Submitted June 16, 1901.   Decided March 1, 1902.

1. FRAUDULENT ASSIGNMENT—*Demurrer—Amended Bill.*
    A bill in equity to enforce a legal claim under section 1, chapter 106, Code, which distinctly attacks a general assignment by the defendant as fraudulent and made with intent to delay, hinder and defraud his creditors and prays that the lien of attachment of plaintiff be established and enforced and for general relief, is good on demurrer and an amended and supplemental bill may properly be filed containing further allegations of fraud and conspiracy in making the assignment, and sale by the trustee thereunder of the assigned property, with prayer that both the assignment and sale by the trustee be set aside as fraudulent and void. (p. 681).

2. GIFT—*Conveyance Fraudulent—Preference.*
    Syllabus pt. 5, *Bank* v. *Parsons,* 42 W. Va. 137 is not applicable in a suit to set aside a gift, conveyance, or transfer, etc. as fraudulent under section 1 chapter 74, Code, and in which the question of unlawful preference is not involved. (p. 681).

3. PURCHASER—*Insolvent's Property—Bidder.*
    When a bidder is paid a consideration to refrain from bidding

on the property of an insolvent debtor in order that the pur-
chaser may obtain it at a reduced price, it is a fraud upon the
rights of creditors.   (p. 688).

4.  DEPOSITIONS—*Exceptions—Court's Decree.*
      When evidence is introduced in a cause to which there are
objections and exceptions taken and a decree rendered without
the court passing upon such objections and exceptions and
there is sufficient legal evidence in the cause together with the
facts and circumstances of the case to justify the decree, the
same will not be reversed because the court may have consid-
ered at the hearing the evidence so objected and excepted to;
or because it failed to prepare such objections and exceptions.
(p. 692).

Appeal from Circuit Court, Wood County.

Bill by the First National Bank of Parkersburg against Isaac
Prager & Son.   Decree for plaintiff.   Defendant appeals.

*Affirmed.*

W. N. MILLER, for appellant.

CAMDEN & PETERKIN, for appellees.

McWHORTER, JUDGE:

Isaac Prager and Maurice Prager, partners as Isaac Prager
& Son merchants doing business in the City of Parkersburg,
running three stores one known as the "Big Store" where their
principal business was done on Market Street and on the op-
osite side of the street their "Auction Store" and another store
called "The Racket." Though apparently doing a large and
prosperous business they had become involved to the extent of
total insolvency and on the 29th of December, 1896, made a
deed of general assignment to Henry Keller, trustee, conveying
"all and singular every and all fixtures, stock in trade, goods,
wares, merchandise, book accounts, notes, bonds and evidences
of debt, policies of insurance and all other property and assets
of every kind, character and description owned or ———— by
said·firm wherever the same may be situated including the un-
expired terms of years or agreement for any premises occupied
by said firm and especially and singular such property, goods,
wares, merchandise and fixtures in and upon the premises oc-
cupied by said firm in what is known as the 'Smith Building,'
Nos. 308 and 310, Market Street, 'Racket Store' No. 313, Mar-

ket Street and the room No. — Market Street in said city, but not including and expressly excepting all property exempt by law." Said deed provided that on the execution and delivery thereof the said trustee should take full possession and custody of said property, make a full inventory thereof and have the same appraised as to value by three competent and qualified appraisers who should be duly sworn for the purpose to honestly, fairly and to the best of their judgment, skill and ability appraise and value such property, and said trustee was authorized thereby "to sell such property at public or private sale and collect book accounts, notes or evidences of debt due and owing said firm; and in making sale of such property he may, if in his judgment that would be most advantageous to creditors, keep such store open and sell such goods, wares and merchandise and other property at private sale; remove the goods all into one room to minimize expenses; to reduce such property to money as soon as the same can wisely, prudently and properly be done, using his (said party of the second part) best judgment therein and for that purpose, at his best discretion and judgment, he may compromise claims, discount bills and may complete or refuse to complete and cancel contracts of said firm now in force so that the largest sum possible under the circumstances may be realized; and in the execution of this trust may employ such labor as shall, in his opinion, be necessary and proper for the economical and faithful administration of the trust hereby imposed upon him or shall be requested by the creditors secured thereby. The trustee was further authorized to pay, satisfy and discharge from the proceeds after deducting all necessary costs, expenses and charges including preparation of the deed and advice of counsel necessary to a proper execution of his duties and other debts, liabilities and obligations which were by the then existing law entitled to preference of payment in full, all other debts, liabilities and obligations of said firm equitably and ratably without preference or priority among creditors of the same class unsecured or to such secured creditors as should surrender to him the security held by them and accept the promise hereof, the creditors of said copartnership being first paid out of said property, said trustee to make such payment by such installments and at such times as he should think fit and to pay the surplus, if any, to the party of the first part or the survivor; and the said Isaac Prager by the

same deed conveyed to said trustee a certain piece of real estate
on Juliana Street, 40x170 feet, then occupied by "The Boston
Dry Goods Store" conveyed to said Isaac Prager by John J.
Jackson and wife, which real estate was subject to a deed or
deeds of trusts in favor of the Homestead Building Association,
and other liens thereon having legal preference to be sold by
said trustee as provided by law for cash or on such credit as he
might deem most advantageous, having reference to said liens
and rights to be created, and from the proceeds as well as the
rents to be collected by him in excess of said deeds of trust and
other liens and after deducting expenses, commissions and
charges to pay the individual creditors of said Isaac Prager, and
if any surplus to be paid to the creditors of the firm, which deed
of assignment was recorded on the day of its execution and
the trustee on that day took possession of the property so con-
veyed. On the same day of the making of the assignment
Julius Katzenstein brought his action of *assumpsit* in the cir-
cuit court of Wood County against said firm and filed his affi-
davit and sued out an attachment against the firm claiming that
he was entitled to recover in said action forty-one thousand nine
hundred and eighty-six dollars and caused the same to be levied
on the goods of Isaac Prager & Son in the said three stores,
which levy was made on the said 29th of December at 4:53
P. M. Katzenstein afterward took judgment by default on the
17th of February, 1897, in said action for thirty-seven thousand
nine hundred and eighty-three dollars and eight cents. On the
same day Henry Keller, the trustee, moved to quash the attach-
ment of said Katzenstein, which motion was set down for ar-
gument.

On the 31st day of December, 1896, the First National Bank
of Parkersburg filed the affidavit for attachment in the circuit
court of Wood County of H. H. Moss, its cashier, and instituted
suit in equity to recover its debt against said Isaac. Prager &
Son, and sued out its attachment without bond and on that day
levied same on the said goods in the three stores and also served
the same on Henry Keller, the assignee in said deed of assign-
ment, as being indebted to or having in his possession the effects
of Isaac Prager & Son, and at the January rules, 1897, said
bank filed its bill in said court against said Isaac Prager &
Son, and Henry Keller as trustee and in his own right; said
bill set up the claim of the said plaintiff, being four notes of

Isaac Prager endorsed by Isaac Prager & Son amounting in the aggregate to twenty-five hundred dollars, and all of which would fall due on different dates shortly thereafter, alleging the insolvency of Isaac Prager & Son and Isaac Prager individually, and that said notes would not be paid when due and payable by them; alleging the execution of the assignment for the pretended benefit of their creditors but which they allege was made in reality to defeat and defraud their creditors; that while it pretended to include and embrace all the property and assets that it did not do so, that before making said assignment said firm shipped goods consigned to Max Adler, Gallipolis, Ohio, when there was no such person there and no sale of said goods had been made; but said shipment was a fraudulent attempt to make away with a part of the goods of said firm for the purpose of defrauding their said creditors; that shortly before making said assignment said firm had collected all the ready cash they could in their business and discounted bills payable to them by many of the best citizens of Parkersburg to get hold of and conceal and make away with said money and sold goods at prices ruiniously below costs, and in this way and in other ways large sums of money were raised by them and appropriated and withdrawn from their business and kept concealed by them for the purpose of defrauding their creditors; that on the 26th of December, 1896, Maurice Prager, a member of the firm, took a New York draft for two-thousand dollars from plaintiff's banking house and forwarded it to Miriam Prager, daughter of Isaac Prager, who got the money thereon, that just prior to the date of the assignment said firm pretended to sell to Henry Keller, who was afterwards made trustee in said assignment, a valuable music box and other goods for little or no consideration and that said Keller had notice of the coming assignment and the purchase and sale was made for the purpose of aiding Prager & Son in wrongfully defeating the claims of the creditors, all of which Keller had knowledge; that Prager & Son at various dates from the 15th of December to the 24th of December, 1896 placed in the custody and charge of said Henry Keller various sums of money mentioned, amounting in the aggregate to about twenty-two hundred and forty dollars, for the purpose of concealing and wrongfully withholding the same from the creditors of said Prager & Son which was still held by Keller but not as trustee or assignee but for the said wrongful purpose;

that it had sued out and levied said attachment which was a lien upon said goods, that plaintiff had no way of ascertaining the quantity and amount of money, goods, merchandise and other property so delivered to and held by Keller except to have a discovery and disclosure from Keller under his oath, and prayed that he be required to answer, and propounded interrogatories eliciting such information and praying for a decree and provision to be made for the payment of the notes when they should become due and payable, their lien of attachment be established and enforced and their said debts paid out of the property attached and for general relief; and on the 8th day of February, 1897, on motion of plaintiff, by counsel, the attachment returnable on that day was docketed as was the attachment as garnishee, and on the 19th day of February said plaintiff filed its two separate bonds and sued out an additional order of attachment, which bonds were each in the penalty of five thousand dollars, which additional attachment was levied on a part of the said goods, and mentioned in the return of the sheriff, of such levy; and on the 6th day of March the defendant Henry Keller in his own right and as trustee tendered in open court his demurrer to plaintiff's bill and tendered his separate answer to the bill and the defendants, Isaac Prager & Son, also tendered their demurrer to the bill and also their answer, in which demurrers the plaintiff joined and the demurrers were set down for argument and plaintiff took time to except or reply to said answer and on motion of plaintiff it had leave to file an amended bill at rules and make new parties defendant; the bill and answers were all verified. On the 9th day of April, 1897, notice thereof having been given by plaintiff to the defendants, Isaac Prager & Son and Henry Keller, an order was entered directing the sheriff to sell the goods levied upon by him on the 19th of February, 1897. The sheriff reported the sale of said goods which was completed on the 8th day of May, 1897, the gross proceeds of such sale amounting to thirty-five hundred and thirteen dollars and seventeen cents deducting the costs and expenses, five hundred and twenty-two dollars and forty-seven cents, left the net proceeds twenty-nine hundred and ninety dollars and seventy cents.

At June Rules, 1897, plaintiff filed its amended and supplemental bill making the many creditors of the defendants Prager & Son parties defendant, including Julius Katzenstein, alleging

that since the filing of its orignal bill it had learned that there
was a well planned conspiracy between said Isaac Prager & Son,
Julius Katzenstein of Cincinnati, Ohio, Paul Prager, son of
Isaac Prager and son-in-law of Julius Katzenstein, Henry Kel-
ler, and Joe Keller to hinder, delay and defraud plaintiff in its
collection of its debt against said Isaac Prager & Son and that
the alleged assignment of Isaac Prager & Son for the pretended
benefit of their creditors made on the 29th day of December,
1896, as alleged in the original bill was a part and parcel of
said fraudulent conspiracy and said assignment was made for
the express purpose of delaying and defrauding the creditors of
Isaac Prager & Son especially the plaintiff, and that said Henry
Keller had notice and knowledge of said fraudulent intent and
purpose; that said assignment was absolutely fraudulent and
void as to plaintiff and that plaintiff's lien of attachment was
superior and paramount to any title to said goods and chattels
derived under said assignment; that shortly before the assign-
ment in November and December, 1896, the firm purchased on
credit large supplies of dry goods and placed in said stores and
in the month of December began a slaughter sale of the stock of
goods and sold at private sale and public auction for cost and at
a great sacrifice and in the month of December realized from
the sale of said goods at least the sum of eighteen thousand dol-
lars; that the firm up to the date of assignment did all its bank-
ing business with plaintiff except to discount some notes on the
28th day of December at the Wood County Bank, but in the
month of December had only deposited in plaintiff's bank
eighty-four hundred and sixty dollars, of which fifty-one hun-
dred dollars was currency and coin; that about forty-seven
hundred dollars of such currency and coin was taken in at the
"Racket Store" and the "Auction Store" in said month which
left the coin and currency taken in at the "Big Store" practi-
cally unaccounted for, while at least ten thousand dollars was at
the "Big Store" taken in in said month and no part of it turned
over to the assignee or applied to the payment of debts; that in
the said month of December there was paid to Bella Isabell,
daughter of Isaac Prager, by sundry checks three hundred and
five dollars, and to Miriam Prager, another daughter, by checks
six hundred dollars and by New York draft two thousand dol-
lars, to Paul Prager fifty dollars, to Joe Keller, brother of
Henry Keller, seven hundred and twenty-five dollars, to Julius

Katzenstein five hundred dollars; and December 29th to
Maurice Prager by check three hundred and fifty dollars, mak-
ing forty-five hundred and thirty-five dollars out of said sum
of eighty-four hundred and sixty dollars wrongfully paid to
the relations and friends of Isaac Prager & Son for the purpose
in most cases of concealing the same from creditors; that short-
ly before the assignment and in the month of December the
sum of twenty-one hundred and sixty-two dollars was delivered
and transferred to Henry Keller for the same fraudulent pur-
pose; that large quantities of goods were hauled away from said
store, some in the night and under cover of darkness, were
taken to the house of Paul Prager and other places and hidden
and concealed; that the shipment of goods to Gallipolis was done
for the purpose of enabling Katzenstein to sue out an attach-
ment; that Paul Prager, who had been in debt since 1890 or
1891 and had not been engaged in business since except as
clerk, found money to pay off his debts while the other Pragers
were breaking up and Paul Prager did pay off his debts; that
the said Keller in futherance of the fraudulent design pre-
tended to have an inventory and appraisement of said goods,
that the cost marks were carefully removed from said goods
and the appraisers estimated their value as best they could from
the price list and otherwise; that while the appraisement was
being made the sons of Isaac Prager were allowed free access to
the store and at times the assignee and the sons of said Prager
were in the store with the doors barred and bolted and the
blinds drawn; that the assignee pretended there were only
twenty-one thousand and six hundred dollars worth of goods in
said stores as shown by the appraisement, while in fact there
were thirty or forty thousand dollars worth; that it was a part
of the fraudulent scheme and purpose to reduce the appraised
valuation of the goods and sell the same ostensibly to Katzen-
stein at an apparently good price; that the debt or a large part
thereof of said Katzenstein was fictitious; that it was a part of
the fraudulent scheme to enable Katzenstein to obtain the first
lien on said stock which would be sufficient to absorb all the
goods; that Keller, assignee, should allow said judgment to go
by default and after reducing the apparent valuation of the
goods by false and fraudulent appraisement pretended to sell
said stock of goods to Katzenstein at private sale and Paul
Prager his son-in-law was to be placed in charge of the store,

thus the debts of Prager & Son to be wiped out and they still have their stock of goods; that on the 13th of February, 1897, Keller made a private sale of said goods to Katzenstein, which sale was not in good faith in accordance with the duties of the assignee but was made collusively and secretly in furtherance of said fraudulently designed purpose; that the sale was fraudulent and void and vests no title in Katzenstein as against plaintiff; that other parties named in the bill were present to bid on the stock but were refused permission to more than casually examine the goods and were not permitted to inspect the appraisement; that the assignee without the said parties being informed of his intention secretly and privately closed the sale with Katzenstein at fifteen thousand dollars, the other parties being informed of it put in an upset bid for sixteen thousand one hundred and twenty-five dollars; that Katzenstein then bid sixteen thousand two hundred and fifty dollars when they notified Katzenstein that they would make another and higher bid unless he would pay them the sum of five hundred dollars; that Katzenstein, Paul Prager and Henry Keller held a consultation, at the conclusion of which Katzenstein gave to the parties his check for the sum of five hundred dollars payable to Joseph Keller and endorsed by him, which check was cashed at the First National Bank of Parkersburg and paid to J. S. Whittinghill and I. C. Leashop the said parties then refrained from further bids; that said bidders were bought off with the knowledge of Keller, assignee, who then fraudulently sold the goods to Katzenstein for sixteen thousand two hundred and fifty dollars; that said sale was closed on the 13th of February and on the 16th of the same month four heavy wagon loads of dry goods were taken from the store of Prager to the store of Keller, the assignee, which he was to have as his personal consideration for said sale; that the terms of said sale were to be for cash but Katzenstein was permitted to pay eight thousand dollars in cash, the goods were turned over to Paul Prager as pretended manager of said Katzenstein, and within the first fifteen or eighteen working days after the store was opened by Paul Prager, he pretended to pay eight thousand two hundred and fifty dollars out of the proceeds of the sale of said goods to Joe Keller; that all of said money did not come from the proceeds of sale made after the sale to Katzenstein, but also from the sales made before the assignment and the same was really

paid by the said Isaac Prager & Son; that said Henry Keller was endorser on a note of the firm for seven hundred and fifty dollars which had been discounted in plaintiff's bank and fell due about the 15th of January, 1897; that on the 19th of January, Henry Keller took up said note, then stepped out on the street and laughingly tore up said note; that Keller was paid for said note by money given to him by said Prager & Son and as to him was fully paid off by them when the same was destroyed by him; that Isaac Prager had returned from Florida and was again directing the business and his sons and daughter employed in the store; that "the utmost harmony and good feeling is manifested between Katzenstein and the Pragers from the father to the last child, which plaintiff says is not consistent with the relation of defunct debtor and fleeced creditor"; and pray that Isaac Prager and Maurice Prager be required to disclose in their answer what goods they purchased within sixty days before the date of assignment, from whom and on what terms, the amount of sales in the three stores within the thirty days preceding the assignment, what debts or pressing liabilities they paid within the said thirty days, what goods they sold to Joe Keller, the amount thereof, the ordinary retail price, the price they received, the date of sale and how they happened to sell to Joe Keller a job lot of goods at that time, what goods they shipped to Gallipolis, how consigned, for what purpose shipped, and what other shipment of goods they made in December, 1896, how they came to pay Henry Keller, Joe Keller, Mrs. Bella Isabell, Miriam Prager, Maurice Prager, Julius Katzenstein and Paul Prager the sums of money paid to said parties and if they deny paying said particular sums that they disclose what sum they did pay to said parties and why they paid them; that Henry Keller be required to disclose what goods he received directly or indirectly from the stock of the firm either before or after the assignment and what money he received either directly or indirectly from said Prager & Son either before or after the assignment; where he received the money with which he paid off the seven hundred and fifty dollar note of Prager & Son and why he destroyed said note; why he retained possession of the Racket Store room after the expiration of the lease; what use he had for it as assignee; what property, goods, wares and merchandise he sold to Katzenstein for sixteen thousand two hundred and fifty dollars, the terms of sale,

how much he received in cash, how and by whom paid; that Katzenstein be required to file with his answer the original checks, notes and other evidences of alleged indebtedness sued upon by him against Isaac Prager & Son; that said deed of assignment be declared fraudulent and void and set aside as to plaintiff and the sale of goods by Keller, trustee, to Katzenstein be declared null and void and in fraud of the rights of the creditors of Prager & Son especially of plaintiff; that the lien of attachment of plaintiff upon goods seized and taken into possession be established and held to be superior and paramount to the title of Keller, trustee, and of said Katzenstein who purchased from him with knowledge of the pendency of this suit and a decree against Prager & Son for the amount of plaintiff's debt and the proceeds of said attachment property applied to the payment thereof; that the value of the goods and amount of money received by Joe Keller and Henry Keller respecticely be ascertained and they be compelled to account therefor, and for general relief.

On the 30th of March, 1899, the defendants Isaac Prager & Son moved the court to quash the attachment sued out, on the ground that the affidavit filed in open court on March 14, 1899, was insufficient in form and substance and contains no facts warranting the issue of an attachment, which motion was set down for argument and the same day Julius Katzenstein made a similar motion, which was also set down for argument, and said Katzenstein filed his demurrer to the original and amended and supplemental bills, and said Isaac Prager & Son filed their demurrer to the amended and supplemental bill, which demurrers were set down for argument, and on the 5th day of January, 1900, the court overruled the demurrers to the original and amended and supplemental bills and the defendants Isaac Prager & Son, Julius Katzenstein, Henry Keller in his own right and as trustee, and Joe Keller tendered their separate answers to said amended and supplemental bill which were filed and the plaintiff took time to except and reply thereto and the court overruled the motion of Isaac Prager & Son as well as that of Julius Katzenstein to quash the attachment, and the said defendants then moved to quash the attachment for the reason that the supplemental affidavit was not sufficient in law, which motion was also overruled.

The answers of the defendants all deny fraud and all knowl-

edge of fraud on their part and answered in detail the most of the allegations of the amended and supplemental bill. Counsel for plaintiff filed various exceptions to the answers of Isaac Prager & Son and Henry Keller in his own right and as assignee, and of Julius Katzenstein because said answers were evasive, imperfect and insufficient, and on the 23rd day of April, 1900, the court sustained the exceptions Nos. 4, 5, 6, 7, 8 and 9 to the answer of Katzenstein and also sustained exceptions Nos. 2, 8 and 9 to the answer of Henry Keller, and also sustained exceptions Nos. 7, 8, 9, 10 and 11 to the answer of Isaac Prager & Son and required them to answer over as to the portion to which exceptions were sustained within thirty days, and overruled all other exceptions to said answers. The plaintiff excepted to so much of the decree as overruled any of the exceptions to the answers and the defendants excepted to so much of the decree as sustained any of the exceptions to their respective answers. On the first day of May, 1900, the defendant, Julius Katzenstein, filed his amended answer to the amended and supplemental bill accompanied by the original notes and evidence of debt against the defendants Isaac Prager & Son in compliance with said decree and the clerk was ordered to receive said original notes, etc., and safely preserve the same in his office, and the defendants, Isaac Prager & Son, also tendered and filed their additional answer to the amended and supplemental bill; and on the 14th day of August, 1900, Henry Keller, trustee, and Henry Keller by counsel tendered their joint and several answers to the amended bill in response to the order of the court of April 23rd and moved to file the same and plaintiff took time to except or reply to said answer or to move to strike out the same. This answer was verified by W. W. Van Winkle, counsel for respondent, and on the 25th of August, 1900, the motion of plaintiff to strike out the amended answer of Keller and Keller, trustee, was sustained; counsel for Keller then again tendered the said answer with an additional verification by the same attorney, to the filing of which plaintiff objected, the court overruled the objection and filed the answer; plaintiff then moved the court to strike said answer from the records, which motion the court sustained and struck it from the records; plaintiff then by counsel replied generally to the answers of Isaac Prager & Son both original and amended and the answers of Henry Keller to the original and amended

and supplemental bills, and the answer of Joe Keller, and the original and amended answers of Julius Katzenstein to the amended and supplemental bill. The additional verification to said answer of Keller by his said attorney is as follows: "This day personally appeared before the undersigned authority W. W. Van Winkle, who made oath that he is of counsel for said Henry Keller and Henry Keller, trustee; that he drafted both of his answers heretofore filed in this cause, and in doing so thoroughly went over the allegations of the bill and amended and supplemental bills in this cause; that said Henry Keller is not in the State of West Virginia, and when last heard from, about one week ago, by the affiant, he was sick and unable to attend to business, and to the best information of affiant is still sick, and affiant says that the allegations in the foregoing answer, made from knowledge, are true, and such as are made from information, he believes to be true. W. W. Van Winkle." And on the same day, August 25, 1900, an agreement was entered of record between the parties in relation to the reading of certain depositions herein taken in another cause waiving any objections that might be taken thereto because not taken in this case, and notice by defendants that they rely upon and insist on their objections and exceptions noted on depositions and evidence taken and filed in the case and the cause was submitted for final hearing; and on the 9th day of January, 1901, final decree entered in favor of plaintiff for thirty hundred and ninety-eight dollars and seventy-eight cents, which included interest to date of decree; and decreed that the assignment made by Prager & Son, December 29, 1896, was made with intent to delay, hinder and defraud the creditors of said Isaac Prager & Son and particularly of plaintiff; and that said Henry Keller, trustee, had notice thereof and decreed the same to be null and void and wholly set aside as to plaintiff; and also held the sale by the trustee, under the trust deed, to Katzenstein to be like fraudulent, null and void and the same was set aside as to plaintiff; and decreed that plaintiff's orders of attachment sued out in this cause were properly levied by which levy plaintiff acquired a lien upon the goods so levied upon; and confirming the sale of said goods by the sheriff; and decreed that the net proceeds of said sale, twenty-nine hundred and ninety dollars and seventy cents, be paid first, the costs of this suit, and the residue to be applied as a credit on plaintiff's debt of

thirty hundred and ninety-eight dollars and seventy-eight cents. From which decree Julius Katzenstein appealed assigning as error: *First,* the court erred in its vacation order entered April 14, 1897, directing sale of appellant's goods seized under order of attachment, that at the time said order was entered the goods which had been taken into possession by the assignee and appraised and in whom the title had been vested before the institution of the suit had been sold and transferred to appellant and he was in possession thereof and had paid his money to the trustee therefor, and the writ of attachment did not authorize the seizure of appellant's property; that the original attachment and the second order of attachment were void on their face and for want of sufficient affidavit; that there never was any valid levy of the original attachment; that at the time the sale was ordered appellant had not been made a party to the suit; the goods were his; the amended bill had not been filed; the defendants to the original bill had demurred and answered denying all the material allegations of the bill; *second,* the court erred in its order of March 6, 1897, in giving leave to plaintiff to file an amended bill; the original bill and exhibits with it showing the plaintiff's debt was not yet due and a valid and a legal general assignment of the goods having been made, the original bill was not susceptible of amendment and should have been dismissed; *third,* the court erred by its order of March 10, 1899, in giving leave to the plaintiff to file a supplemental affidavit in support of its attachment; *fourth,* the court erred in its order of March 14, 1899, in permitting the plaintiff to file such supplemental affidavit; *fifth,* in its decree of January 5, 1900, in overruling the separate demurrers of Isaac Prager & Son, Henry Keller and Henry Keller, trustee, and appellant to the original and amended and supplemental bills, and in overruling the motion of appellant and Isaac Prager & Son to quash the order of attachment, and in its decree of April 23, 1900, in sustaining the exceptions of plaintiff Nos. 4, 5, 6, 7, 8 and 9 to appellant's answer and requiring him to make any additional answer to the amended and supplemental bill and thereby requiring him to file the original evidence of debt, and in sustaining plaintiff's exceptions Nos. 2, 8 and 9 to the answer of Henry Keller and Henry Keller, trustee, requiring him to make any additional answer to said bill, and in sustaining exceptions Nos. 7, 8, 9, 10 and 11 to the

answer of Isaac Prager & Son, the original answer being full, complete and adequate answers to every material allegation of the bill. The requirement of the court was excessive and oppressive and requiring answer to be made to immaterial allegations upon which no relief was prayed for or could be granted; *seventh,* in its decree of August 25, 1900, in striking out the amended answer of Henry Keller and Henry Keller, trustee, said answer being filed pursuant to a rule of the court, and in its final decree of January 9, 1901, in considering on the hearing of said cause the illegal evidence of the plaintiff including the exhibits therewith and particularly the testimony taken in other causes to which appellant and many of the other parties were not parties, and failing to sustain appellant's objections and exceptions thereto; in decreeing that the general deed of assignment of December 29, 1896, was made with intent to hinder, delay and defraud creditors and in wholly setting aside the same as to said plaintiff; in decreeing that the sale of the trustee to appellant of the goods assigned to him was made with like intent to· hinder and delay creditors and in setting aside the same as void as to plaintiff.

The first, third and fourth assignments can properly be considered together as they relate especially to the attachment and sufficiency of the affidavit and supplemental affidavit in support of the same. It appears from the prayer of the original bill that one purpose of the bill was to enforce a purely legal claim under section 1 of page 106 Code. While many allegations in the bill would make it appear that the suit had a further purpose than simply to enforce said claim, and the prayer for general relief is broad enough to warrant the action of the court in overruling the demurrer and authorizing the filing of an amended and supplemental bill. As to whether the errors under consideration are well taken depends upon the sufficiency of the affidavit and amended affidavit for the attachment as well as the legality of the original levy of said attachment. First as to the sufficiency of the original affidavit. In *Hale* v. *Donahue,* 25 W. Va. 414, (Syl. 1), it is held: "The grounds for the attachment are the conclusions of the law. The 'material facts,' which the statue requires the affiant to state, are the allegations, from which the court may be properly authorized to conclude, that the grounds exist. Consequently an affidavit, which states that a debtor did an act or acts, which of them-

selves are not necessarily fraudulent, with an intent to defraud his creditors, without more is not sufficient." The affidavit in the case at bar first states that "Isaac Prager left the State of West Virginia a few days ago and went by way of Cincinnati on a pretended trip to Florida, and he is still out of the state, and his whereabouts unknown to affiant. The next day, or a day or two thereafter, Mr. J. Katzenstein, who is a father-in-law of Paul Prager, another son of Isaac Prager, and who lives in Cincinnati, came to Parkersburg, in Wood County, and sued out an attachment against Isaac Prager & Son for a large sum of money, to-wit: for forty-one thousand nine hundred and eighty-six dollars, and just a few minutes after a levy of said attachment was made on the goods and property of said Isaac Prager & Son, the said Isaac Prager & Son placed on record in Wood County a pretended general assignment of all their property and assets to Henry Keller, trustee, for the benefit of their creditors, which said pretended assignment is signed by Maurice Prager for himself, and by the latter as pretended attorney in fact for Isaac Prager, and it is not signed by Isaac Prager nor by any one having authority to sign for him, and it is not signed or executed by Isaac Prager & Son. The said J. Katzenstein, who is so closely connected with said Isaac Prager, makes oath in this affidavit for attachment that Isaac Prager & Son have shipped and are shipping their goods out of the State of West Virginia with intent to defraud their creditors. The said Isaac Prager & Son, just shortly before and since said pretended assignment, have withdrawn money from the assets of said firm and have appropriated the same to their own use in fraud of their creditors, and are now concealing the same."

Mr. Prager had a perfect right to take a trip to Florida, and there is no reason given why he should keep the plaintiff advised of his whereabouts. There is nothing contained in the affidavit to show there was anything improper in Katzenstein going to Parkersburg and attempting to save his debt, and the fact that Katzenstein had made oath in his affidavit for attachment that said Prager & Son had shipped and were shipping their goods out of the state with intent to defraud their creditors did not avail the plaintiff in this case. The statement in the affidavit that said Isaac Prager & Son had withdrawn from the assets of said firm and had appropriated the same to their own use and in fraud of their creditors and were then con-

cealing the same, is too general and not sufficiently definite. It is wanting in "time, place and circumstance," nothing to show what sums, if any, were so withdrawn, or how, or the circumstances of such withdrawal. In *Goodman* v. *Henry*, 42 W. Va. 526, it is held that "A statement of material facts in an affidavit for attachment must be certain and definite in a legal point of view, so as to inform those entitled to defend the attachment what particular facts they must repel." As to the general assignment mentioned in the affidavit, it appears from said affidavit that it was made for the benefit of the creditors of said Prager & Son, making no preferences and nothing can be gleaned from the affidavit to show that it was made in fraud of creditors but rather for the benefit of the creditors. The statute provides that an objection to the sufficiency of such facts, the affiant shall have the right within such time, not exceeding ten days as may be prescribed by the court, to file supplemental affidavit stating any other facts which may have come to his knowledge since the filing of the original affidavit and which are relied upon to show the existence of such grounds, and which is made a part of said original affidavit, so that more than two years after issuing out the attachment, on the 14th of February, 1899, plaintiff filed a supplemental affidavit. It will be observed that such supplemental affidavit can only relate to facts which existed at the time of the filing of the original affidavit but came to the knowledge of the affiant afterwards. After repeating a large part of the first affidavit in the supplemental affidavit, affiant says that in the months of November and December, prior to making said assignment, the said Prager and Son purchased large quantities of dry goods on credit and placed the same in their store rooms in Parkersburg, and shortly prior to the date of the assignment, in December, 1896, the firm made a slaughter sale of said goods and sold a great many of the same at ruinously low prices and realized large sums of money, a great portion of which said firm abstracted and withdrew from their assets and concealed the same from their creditors and refused to turn over said money or any part of it to said assignee. The affidavit fails to state what goods were so purchased and placed in the stores, where and from whom they were purchased, and what amounts, if any, were so abstracted and withdrawn from the assets and concealed, or what sums they so used. In *Sandheger* v. *Hosey*, 26 W. Va. 221, (Syl. 2),

"An affidavit alleges the 'material facts' for an attachment to be 'that the defendant is hiding and concealing a large part of the stock of liquors and wines which the plaintiff sold and delivered to him.' *Held*: Insufficient to sustain the order of attachment." *Roberts* v. *Burns,* 48 W. Va. 92, (35 S. E. 922).

A further allegation in said supplemental affidavit is, that shortly prior to the date of said assignment, to-wit: in the month of December, 1896, the said firm shipped about seven-hundred dollars worth of goods to Max Adler at Gallipolis, Ohio, who was a fictitious person and was a mere dummy of said Isaac Prager & Son. This allegation fails to show that shipping was done for any fraudulent purpose or that the shippers knew that Max Adler was a fictitious person. In *Delaplain* v. *Armstrong,* 21 W. Va. 211, JUDGE SNYDER in delivering the opinion of the court, in treating of the allegations of the affidavit, says: "The first material fact is, 'defendants are shipping staves and railroad ties out of this state, disposing of them without applying the proceeds of sale on this debt as promised by them'", and says, "This statement amounts to an averment that the defendants have not paid the plaintiff's debt as they promised to do. This is quite a common complaint. But it is certainly not of the character which authorizes an attachment. The fact that the defendants are shipping staves and ties out of the state and disposing of them does not show a fraudulent intent. The selling of staves and ties may, for all that appears, be the business in which the defendants are engaged; and if they can obtain a better price by shipping and selling them outside of the state than in it, this act is evidence of an honest rather than a fraudulent intent."

It is then further alleged in the affidavit, "that just prior to making said deed of assignment and after having committed said fraudulent acts hereinbefore alleged, the said Isaac Prager left the State of West Virginia and went to Florida and thereby avoided the service of process in the suits of creditors against said firm." There is nothing in either affidavit showing that any suits were instituted except the original affidavit mentions an attachment sued out by Katzenstein. Maurice Prager, the partner of said Isaac Prager, was left in charge of the stores, and the property left subject to the process of the court. The supplemental affidavit further alleges that Isaac Prager & Son

called on many of their customers, some of them the most responsible parties in the City of Parkersburg, and induced them to make cash settlements of their accounts due and not due to said firm by allowing a heavy discount on the same, thereby raising large sums of money, which they withdrew from the assets of the firm and concealed from their creditors and appropriated same to their own use. Affiant fails to give any particulars, does not give the name of a single customer so discounting his debt, nor when nor what amount.

Another allegation in said affidavit is that shortly prior to said assignment said firm of Isaac Prager & Son discounted certain notes of customers of said firm at the Wood County Bank in Parkersburg and thereby raised the sum of seven hundred dollars, which said firm of Isaac Prager & Son withdrew from the assets of said firm and concealed from their creditors and appropriated to their own use. This is the most definite allegation in the affidavit, but it is further alleged that the fact of this transaction was known to affiant at the time of making his former affidavit but through inadvertance was omitted from the same, so that this was not a fact which had come to his knowledge after the filing of the original affidavit. It seems strange indeed that with all the material which enables the pleader to get up a bill of some forty pages filled with allegations of fraud, that he could not prepare an affidavit sufficiently definite and explicit to support an attachment, but such is the case. The said original and amended bills attack directly for fraud in fact the assignment of December 29, 1896, and the sale made by the trustee thereunder to Katzenstein, which being sustained entitles the plaintiffs to a lien on the property so assigned and sold from the date of the filing of their original bill. *Richardson* v. *Ralphsnyder,* 40 W. Va. 15; *Wallace* v. *Treakle,* 27 Grat. 479; section 2, chapter 133, Code; *Foley* v. *Ruley* and *Wilson* v. *Carrico* decided at Fall term, 1901, this Court. And having the parties and the fund arising from the property sold under the order of court as well as the property assigned all before the court and no other creditor appearing in this suit to set up his claim, it becomes immaterial as to the sufficiency of the affidavits for the attachment as well as of the attachment, and the appellant is not prejudiced by the sale of the goods under the order of the court.

It is claimed by appellant and by Keller, the trustee, under

the second assignment of error that the supplemental and amended bill should not have been permitted to be filed because they say it is not a creditor's bill, that the bank was suing solely on its own account and cites *Straughan* v. *Hallwood,* 30 W. Va. 274, which is not applicable to the case at bar. The original bill while it did not pray for the setting aside of the assignment did attack it for fraud and the amended and supplemental bill was for the same purpose, making additional allegations of fraud and making all the creditors of Prager & Son parties to said bill that they might come in and protect their interests in the proceeding.

The fifth assignment of error, that the court erred in overruling the separate demurrers of Isaac Prager & Son, Henry Keller and Keller, trustee, and the appellant to the original and amended and supplemental bills. It is claimed that as the deed of assignment conveyed all the property of the assignors, wherever situated for the general benefit of all creditors without priority or preference and that it was in form and effect the only kind of deed of assignment which a debtor, under the assignment law of West Virginia, could make either under chapter 72 or chapter 74 of the Code, and does not appear fraudulent on its face, that the same cannot be attacked for acts of fraud committed previous or subsequent to the execution of said deed. Section 1, chapter 74, Code, provides that "Every gift, conveyance, assignment, or transfer of, or charge upon, any estate, real or personal, * * * with intent to delay, hinder, or defraud creditors, purchasers or other persons, of or from what they are or may be lawfully entitled to, shall as to such creditors, purchasers or other persons, their representatives or assigns, be void." In *Loos* v. *Wilkinson,* 110 N. Y. 195, at page 210, the court say: "Frauds upon the assignment either by the assignor or assignee do not necessarily avoid the assignment but that may be considered in determining whether there was any fraud in the assignment and frequently furnish very convincing and sometimes very conclusive evidence upon that point." And in *Aaronson* v. *Deutsch,* 24 Fed. Rep. 465, it is held: "The rule that a deed valid in its inception will not be rendered invalid by any subsequent fraudulent or illegal act of the parties has no application when the fraudulent or illegal act is the consummation of an illegal agreement made contemporaneously

with the deed. In such case the illegal act is part of the original design, and the deed is void *ab initio."*

*Schultz* v. *Hoagland,* 85 N. Y. 464. In *Parker* v. *Valentine,* 27 W. Va. 677, it is held: "Fraud may be inferred from the facts and circumstances of the case and if these facts and circumstances are such as to make a *prima facie* case of fraudulent intent, they are to be taken as conclusive evidence of such intent, unless rebutted by other facts and circumstances in the case." And in the case of *Douglass* v. *Laird,* 37 W. Va. 687, a deed of trust was held to be fraudulent but not on its face, and the trustee held to have notice of the grantor's fraudulent intent. In *Richardson* v. *Ralphsnyder,* cited (Syl. 4), "Where an assignment of personal property is made in fraud of creditors, they, or any of them, may, in a court of equity, have the same set aside. The creditor who first files his bill obtains thereby a priority, and is entitled to be first paid from the proceeds of the sale of the property, if there are no valid prior liens." *Reilly* v. *Barr,* 34 W. Va. 95; *Sturm* v. *Chalfant,* 38 W. Va. 248. It is contended by appellees that by the act of 1891, amending section 2, chapter 74, Code, "the whole policy of the laws relating to 'Insolvent Debtors' was changed." The change there made related solely to transactions between debtor and creditor and was intended to prevent the preference of creditors and was not intended to, and did not affect section 1, chapter 74, relating to fraudulent conveyances. Section 2, chapter 133, Code, provides: "A creditor, before obtaining a judgment or decree for his claim, may institute any suit to avoid a gift, conveyance, assignment, or transfer of, or charge upon, the estate of his debtor, which he might institute after obtaining such judgment or decree, and he may in such suit have all the relief in respect to said estate, for the claim which he may be entitled to recover." In *Bank* v. *Parsons,* 42 W. Va. 137, under the ruling of which appellant claims, if the assignment is set aside it would result in giving plaintiff an illegal preference, under section 2, chapter 74, Code. The question alone of unlawful preference was there involved and Syl. 5, "The creditor who is first to assail the fraudulent conveyance of an insolvent debtor does not thereby acquire as the reward of his diligence a preference over the other creditors," could only apply in such case as was there before the court, and cannot be construed to apply in a proceeding to set aside a gift, conveyance, assign-

ment, etc., under section 1, chapter 74, Code, where the question of preference is not involved. Such a construction would be a repeal by this Court of section 2, chapter 133, Code, which it is not competent to do, and the said syllabus, if susceptible of such construction, should be so modified as to confine it to proceedings to avoid illegal preferences. This Court has not given it such broad construction as will appear from *Foley* v. *Ruley* and *Wilson* v. *Carrico* not yet reported. And in *Bowyer* v. *Martin,* 27 W. Va. 442, it is held: "Although a deed be made for a valuable consideration, yet if the intent of the grantor in making it was to hinder, delay or defraud his creditors, the deed is fraudulent in fact as to the grantor, and also as to the grantee if he had notice of such fraudulent intent." *Silverman* v. *Greaser,* 27 W. Va. 550; *Goshorn* v. *Snodgrass,* 17 W. Va. 717.

The bill having sufficiently charged fraud and the amended and supplemental bill being based upon the former and to carry out the same purpose was properly filed and were both good on demurrer.

The sixth assignment that the decree of April 23rd erroneously sustained the plaintiff's exceptions to the several answers of appellant, and Henry Keller and Henry Keller, trustee, and of Isaac Prager & Son because appellant says the answers were full, complete and adequate answers to every material allegation of the bill. As to exception No. 4 to the answer of appellant, the allegation of the bill was, that the debts of the appellant were fictitious as to the greater part thereof, and that because of the fraudulent concealment of the books and accounts of said assignee it was not advised how much said firm did owe said Katzenstein, if anything, but that they did not owe him the sum of thirty-seven thousand nine-hundred and eighty-three dollars, the amount for which judgment by default was obtained and called for full proof of the exact amount, if any, owed on said debt at the time of the assignment with all particulars in regard thereto. Respondent answered denying that the deed was fictitious that he did not know what the books of account of the firm showed in relation thereto, but to the best of his knowledge and belief the firm owed him every dollar of the amount for which he recovered judgment; that he still held the evidence of the debt set forth in his declaration in his suit brought against the firm; that said debt was in part of long

standing and accumulation and for proof thereof called for by plaintiff tendered and filed with his answer copies of the notes and checks but retained the originals and professed his willingness to produce them in court if required to do so, protesting that the plaintiff had no right, by reason of anything alleged in its bill, to call for any proof of his claim in this proceeding, which answer was excepted to by plaintiff as being evasive, imperfect, insufficient and argumentative and especially to that part of the answer which filed copies of said evidence of debt instead of originals as called for by the bill. Plaintiff in its bill prayed that the said Katzenstein be required under oath to state with minutest particularity when and how each item of indebtedness was incurred, in what manner, through what bank or banks, and at what dates the money pretended to have been advanced by him was paid and remitted to Isaac Prager & Son or Isaac Prager & Sons, to which he answered by refering to ·his declaration in his action at law, a part of the exhibit No. 2 with the amended and supplemental bill and also to an amended affidavit for an attachment to be filed by him in said state court, a copy of which was ·filed with his answer as an exhibit; and also referring to the checks and notes evidencing the transaction, which answer was excepted to by plaintiff as evasive, imperfect and insufficient, which is the fifth exception noted in the assignment of error. These exceptions were well taken and properly sustained because under the allegations of the bill, the amended and supplemental bill, plaintiff was entitled to have exhibited with the answer the original evidences of debt and the information prayed for. The sixth exception is that respondent failed to answer at all as to "How he happened to come to Parkersburg on December 26 or 28, 1896, and at whose house he stayed while there." Under the theory of the bill this might be important as showing his relation to the ·Pragers and whether he was induced to go to Parkersburg by the Pragers or any of them, and for the same reason his failure to answer the interrogatory "Whether or not he met and talked with Isaac Prager in Cincinnati or elsewhere between December 20 and· December 29, 1896," the exception was properly sustained. And the ninth exception was as to his failure to respond to the prayer of the bill, that he be required to file with his answer the original checks, notes and other evidence of alleged indebtedness sued upon by him in said action against

Isaac Prager & Son. This is disposed of as being the same in substance as the fourth exception. As to exception No. 2 to the answer of Keller, trustee, to the allegation in plaintiff's bill that shortly before making said assignment, to-wit: in November and December, 1896, Isaac Prager went to Baltimore and New York and purchased on credit large supplies of dry goods and had the same shipped to, and the same were placed in said stores in Parkersburg, to which allegation Keller replied that he had heard of the said Isaac Prager going to Baltimore and New York in November and December, 1896, prior to the assignment which was not unusual as Isaac Prager spent most of his time in New York, but from information and belief, and not from personal knowledge, denied that the said Prager purchased on credit for the firm large supplies of dry goods in excess of the demands of the business and had them placed in the Parkersburg stores. This answer is clearly evasive and it is impossible to conclude from the answer whether he had personal knowledge of such purchases or not. The bill contained a prayer that said Keller be required to disclose in his answer, what goods were received by him directly or indirectly from the stock of Isaac Prager & Son either before or after said assignment, to which he responded "That he had fully answered in his foregoing answer that he purchased and paid for a music box that was in the stock of said Isaac Prager & Son and received *no goods directly for the same.*" This is virtually no answer to the question, what goods he had received directly or indirectly from the stock of Isaac Prager & Son either before or after said assignment, which exception, No. 8, was therefore well taken. And the ninth exception was that he failed in any manner to answer the interrogatory, "Also what money he received either directly or indirectly from said Isaac Prager & Son either before or after the date of said assignment," to which plaintiff had right to an answer. As to sustaining exceptions Nos. 7, 8, 9, 10 and 11 to the answer of Isaac Prager & Son, the bill prayed that respondents be required to disclose under oath in their answer what goods they purchased within sixty days prior to the date of said assignment, from whom they purchased them and on what terms, to which they responded that it was impossible for them to state the amount of goods they purchased for sixty days prior to their said assignment or to give the names of the persons from whom they purchased said goods, or the

terms, and denied the right of plaintiff to be entitled to any
specific answer to said allegation, and alleged that the assign-
ment was made in absolute good faith and plaintiff could not be
prejudiced by their failure to answer, nor benefited by such dis-
closure, that whatever goods were purchased prior to the as-
signment and remained unsold at its date passed to the assignee,
Henry Keller, and the creditors received the full benefit of all
the purchases so made and of the proceeds of sales of goods be-
tween the dates of their being placed in the stores and of the
assignment, to which answer exception No. 7 is made as evasive,
imperfect and insufficient. The bill further prays that they be
required to disclose on oath the amount of sales made by them
in the "Big Store," the "Racket Store," and the "Auction
Store" within the thirty days preceding the date of said assign-
ment, state the amount of said sales in each store separately, to
which requirement respondents answering said, it was impos-
sible for them to so disclose on oath the amount of sales made
at each store in the time mentioned, that they had not the books,
which were in possession of the assignee, that they could not
state the amount of sales in each store separately, that plaintiff
could not in any manner be benefited by such disclosure, nor
could a failure to make such disclosure in any manner operate
to the prejudice of the plaintiff; that sales made by respondents
from each of said stores within the said thirty days were made
in good faith and all the money received from and on account of
the sales was used for the purpose of paying debts and expenses
and in the legitimate discharge of obligations, and no disclo-
sure as to the amount of money received could in any manner
benefit the plaintiff or any other creditor of respondents to
which response exception No. 8 by plaintiff was made as being
evasive, imperfect and insufficient. These exceptions were well
taken as it was alleged as part of the scheme that defendants
put into said stores large supplies of goods purchased on credit
for the purpose of meeting the holiday trade and converting the
same into money, and it is alleged and shown that large sales
were made up to about the date of assignment and it does not
appear that any moneys passed into the hands of the assignee
under the assignment, not even the receipts from the sales of
the day of the assignment and it was very pertinent in the prose-
cution of this suit to ascertain what goods were so placed in the
stores, what sales made and the receipts from such sales and

what became of such receipts. They were further required to disclose what debts or pressing liabilities they paid within thirty days and to file a list of the same with the receipts for the amounts paid, and also how much and what goods they sold to Joe Keller, the amount thereof, ordinary retail price and the price which they received for such goods; the date of said sale and how they happened to sell to Joe Keller a job lot of goods at said time, to which they responded that it was impossible for them, in the absence of the books, to disclose what debts or pressing liabilities they paid within the sixty days before said assignment, or to file a list of the same with receipt for the amounts paid, or what goods they sold to Joe Keller, the amount thereof, the ordinary price and the price which they received, but it was a very small amount of goods and they were sold at an adequate price; that the reason they sold the goods to Joe Keller was that they had more of that character of goods than they could carry on account of the peculiar nature of the season and the necessity of making as great sales as they possibly could, to which response plaintiff entered exception No. 9. And exception No. 10 is as to the fact respondent wholly failed to make any answer to the requirement as to "what other shipment of goods they made in December, 1896." And No. 11 is an exception to their response to the requirement as to "how they came to pay out to Henry Keller, Joe Keller, Mrs. Bella Isabell, Miriam Prager, Maurice Prager, Julius Katzenstein, and Paul Prager the sums of money hereinbefore charged to have been paid to said parties; and if they deny said particular sums, that they be required to disclose what sums they paid to said parties respectively and why they paid them," to which they responded that whatever sums were paid to those persons were paid in the regular course of business; that answer had already been fully made in reference thereto so far as it could benefit the plaintiff whatever in the matter of this suit. Plaintiff was entitled to definite and explicit answer to all these enquiries and especially to the payment of such large sums of money to members of the family within a day or two of the date of the assignment, surely the creditors were entitled to know where these large sums of money went and for what purpose; that two thousand dollars paid to the daughter of the head of the insolvent firm three days before the assignment is a matter needing frank and honest explanation further than "that the proceeds thereof

were used ligitimately and legally in and about the business affairs of respondents and without any fraud whatever."

The seventh assignment that "Court erred in striking out the amended answer of Henry Keller and Henry Keller, trustee, the answer being filed in pursuance of the rule of the court and the same being properly verified." Keller was charged in the bill with being a conspirator and with many specified acts on his part, especially in his capacity of trustee, which required to be answered and explained by him personally under his oath; the bill being verified by the oath of the cashier of the plaintiff bank; verification by defendant's attorney could not properly be substituted, the conscience of the defendant trustee was not in the keeping of his attorney, nor could it be reached through an answer verified by his attorney, and the plaintiff was entitled to his personal response.

As to the eighth assignment which relates to the final decree of January 9th, it was error to decree that the general deed of assignment of December 29, 1896, was made with intent to delay, hinder and defraud creditors; that the sale of the goods by the trustee, Keller, to Katzenstein was made for the same purpose, both of which were erroneously set aside as fraudulent. Perry on Trusts, s. 590, says "general assignments will be void if affected by actual fraud: as if the purpose is to hinder, delay, and defraud the creditors, or any one or more of them." *Foley* v. *Bitter,* 34 Md. 646. That the purpose of the defendants, Prager & Son and Katzenstein, with the full knowledge and aid of the defendant, trustee Keller, was to get the goods into the hands and control of the said Katzenstein, thence indirectly into the hands of the Pragers to the exclusion of all other creditors is well demonstrated from the facts and circumstances and evidence in the case. Isaac Prager & Son were doing a large and apparently prosperous business in Parkersburg carrying a heavy stock of goods in one store called "The Big Store" from which they supplied goods to the amount of five thousand dollars or more to a store called "The Racket" and also carried on an auction store. It is admitted as well as proven that shortly before the holidays in 1896 they bought large stocks of goods and placed in said stores and made, what is termed in these proceedings a slaughter sale, selling goods for cash, taking in large sums of money and discounted claims against citizens of Parkersburg for cash or notes, some of which notes they ad-

mitted were discounted to the amount of seven hundred dollars at the Wood County Bank, not at the bank where they had been doing their business.   About the 22nd and 24th of December they shipped to Gallipolis a lot of goods consigned to Max Adler, admitted to be a fictitious person.   In the month of December they paid to Miriam Prager by sundry checks six hundred dollars and on the 26th of the same month, three days before the assignment, sent a draft to the same person for two-thousand dollars; paid other members of the family by checks several hundred dollars amounting in all to more than four thousand dollars.   Katzenstein seized the goods by attachment shipped to Gallipolis and was on hand at Parkersburg on the day of the assignment and on that day filed his affidavit in the circuit court for an attachment against the firm of Isaac Prager & Son claiming that they owed him forty-one thousand nine hundred and eighty-six dollars; alleging acts of fraud against them in his affidavit for the attachment.   It would seem either by understanding among the parties or by a singular coincidence that the attachment by Katzenstein and the general deed of assignment were prepared at the same time and the attachment levied on the goods, then in a few minutes thereafter the assignment was placed on record in the clerk's office; the assignee, Keller, took immediate possession of the goods.   The money taken in at the "Racket" that day is shown to have been taken out by the firm and it is not pretended that any money from any of the stores or from the bank passed into the hands of the assignee, nothing but the goods as they stood in the store. Plaintiff's attachment was sued out on the 31st of December, two days after the assignment, and was levied upon the goods. Henry Keller, the trustee, had known for sometime that the firm of Isaac Prager & Son was in a failing condition and that he was to be the assignee when they made their assignment; he was also an endorser for the firm to some extent, at least on one note for seven hundred and fifty dollars.   Notwithstanding the attachments standing against said property the trustee was trying to make sale of the same, or pretended to, and as early as February 2nd wrote to Benjamin Friedman, a creditor and a prospective bidder and who came on to Parkersburg to put in a bid, that he was getting ready to sell the stock and hoped to do so within ten days, stating that he had had several "talks with brother Maurice and Paul and both promised me that should

they get on their feet they will positively see that you are paid."
In the same letter he states, "I have several buyers, one of which
is Mr. K. of Cincinnati who I suppose if he gets it will put Paul
in it." The assignee refused to allow the said Benjamin Fried-
man and other bidders to examine the stock of goods except in a
most cursory way, nor would he permit them to examine the ap-
praisement and invoice, and stated that by advice of his coun-
sel he had decided to show the appraisement to nobody. There
were other parties there who desired to bid on the property, of
which he was informed, but he quietly accepted the bid of Kat-
zenstein of fifteen thousand dollars and closed the sale; when
other bidders learned the fact they put in a bid of sixteen thou-
sand one hundred and twenty-five dollars; then the assignee
saw Katzenstein and received his bid for one hundred and
twenty-five dollars more; the bidders then proposed to put in a
still higher bid, when Katzenstein paid them five hundred dol-
lars to refrain from bidding, which they did and the sale was
made to Katzenstein at the sum of sixteen thousand two hun-
dred and fifty dollars. The assignee represented to the other
bidders that the terms of sale were strictly cash, as stated by
Friedman, but the sale made to Katzenstein was for eight thou-
sand dollars cash and the residue on time. Friedman says that
Keller told him that the bids had been opened and finally
awarded to Mr. Katzenstein for about sixteen thousand dollars
and that the Louisville parties had received five hundred to
withdraw as a bidder and that a few moments afterwards Paul
Prager came in and repeated the same thing. Where a bidder
is paid a consideration to refrain from bidding on the property
of an insolvent debtor that the purchaser may obtain it at a re-
duced price it is a fraud upon the rights of creditors. *Morris*
v. *Woodyard*, 25 N. J. Eq. 32; *Slingluff* v. *Eckell*, 24 Pa. St.
472; *Gardner* v. *Morris*, 25 Me. 144. Keller knew of the trans-
action between Katzenstein and the bidders, whom he silenced
by the payment of five hundred dollars, and his letter referred
to of February 2nd shows that he expected Katzenstein to buy
the property and place it in the charge of his son-in-law, Paul
Prager, as was done after his purchase. Henry Keller took up
the note of seven hundred and fifty dollars upon which he was
endorser for the Pragers and as he left the bank on the street
he tore the note up, jocularly remarking that there was a lot of
good money gone, or something of that kind. Plaintiff proves

by J. L. Buckley a conversation which occurred in Mr. Rauch's in which he says "Maurice Prager came into my store and we went around to Rauch's store with him. He and I were both endorsers on a certain one thousand four hundred dollar note, and while we were in there Mr. Joe Keller came in and joined in the conversation and said there was no use of either one of us getting the least agitated or worried over it in the world, because neither of us would ever lose a cent, he would guarantee it, was the remark he made. He made a very extravagant remark; he said he would take Maurice Prager for a half million dollars." And further stated that he had assurance from Paul Prager that he would never lose anything by his endorsement of Mr. Prager's paper; and that payments were afterward made upon it by Paul Prager; that Henry Keller afterwards asked him how much had been paid and if the contract was being carried out, but added really there was no contract, just the assurance of Paul Prager. Charles M. Rauch testifies that he was endorser on a fourteen hundred dollar note for Pragers; that it was afterwards paid by Paul Prager. Paul Prager was a son of Isaac Prager and son-in-law of Katzenstein and had been a partner in former years with some of the other Pragers and had become involved to the amount of four thousand or five thousand dollars, and after this assignment paid off all his old debts and assisted in paying off the notes on which Buckley and Rauch were endorsers. It is shown by the evidence of Edward Nelly, paying teller of the Wood County Bank, that Maurice Prager presented the check of Henry Keller for three hundred dollars on the 2nd day of July, 1897, and was paid for it four fifty dollar certificates and five twenty dollar bills. The four fifty dollar certificates and five twenty dollar bills are shown by the evidence of Hiteshew, teller in the First National Bank, to have been paid in on this note by Charles Rauch on July 2nd, 1897, the same day on which the check for three hundred dollars of Henry Keller was paid to Maurice Prager, and Rauch testifies that he paid the identical money that was handed to him by Paul Prager and it is recognized by the paying teller of Wood County Bank by a memorandum taken by him of the notes at the time it was paid out; so that we find Henry Keller assisting in the payment of the notes of Prager & Son endorsed by Rauch, showing clearly that Keller knew of the arrangement thereof, and was assisting therein. Second Perry on Trusts,

sec. 591: "If the assignor secretly, and without the knowledge of the general creditors, pays extra money, or gives a special advantage to some particular creditor to procure his assent to the assignment, or to secure his influence with other creditors in gaining their assent or discharge, such assignment will be illegal and void, as a fraud upon the general creditors; and if the general creditors have signed a release of their claims, such release will be no bar to an action against the debtor." *Mare* v. *Sanford*, 1 Gif. 288; *Case* v. *Gerrish*, 15 Pick. 50; *Ramsdell* v. *Edgarton*, 8 Met. 227; *Partridge* v. *Messer*, 14 Gray 180. Here we have not only the debtor carrying out the arrangement but the assignee assisting him.

Another phase of the case which makes it look very suspicious on the part of Keller as being in collusion with Katzenstein and the Pragers is the fact of his pushing through a sale of the goods when there were clouds upon the title in the way of suits pending and attachments levied upon the goods. In *Rosette* v. *Fisher*, 11 Grat. 498, the court says: "A trustee in a deed of trust is the agent of both parties and bound to act impartially between them; nor ought he to permit the urgency of the creditors to force the sale under circumstances unjust to the debtor at an inadequate price." In *Livey* v. *Winton*, 30 W. Va. 554, at page 560, in referring to the duties of trustees, says: "He may and ought, on his own motion, to apply to a court of equity to remove impediments to a fair execution of his trust, to remove any cloud hanging over the title, and to adjust accounts, if necessary, in order to ascertain the actual debt which ought to to be raised by the sale, or the amount of prior incumbrances; and he will be justified in delaying, for these preliminary purposes, the sale of the property, until such resort may be had to a court of equity." It is charged in the bill that about the time of the assignment four wagon loads of goods were taken from the store of the Pragers to Henry Keller's. While this is denied in the answer of Keller, it is proven by witness George N. Pribble, who was then a salesman in Kellar's store, that four wagon loads of goods were brought to Henry Keller's and divided and a part of them taken by Joe Keller and a part left at Henry Keller's store where they were put in stock and sold in the regular course of business; witness says this was about the time of the assignment but could not say whether it was before or after. In *Blackshire* v. *Pettit*, 35 W. Va. 547, (Syl. 2) it

is held: "When the plaintiff has shown that the conveyance was made by the grantor with intent to delay, hinder or defraud creditors, then the grantee must meet this by showing that he was a purchaser for value, and without notice of the fraudulent intent of his grantor; and the recital in the deed of the payment of the purchase-money is not sufficient." The defendants, Prager & Son, Henry Keller and Katzenstein, made no attempt to meet by proof the evidence adduced by plaintiffs; not one of them went upon the witness stand to subject himself to cross examination, nor to explain the many acts which were charged and proved against him, but content themselves with the answers they filed, which in many particulars were evasive and indefinite. If the transactions had been honest and square they could have been well explained. Truth is consistent in all its parts and in harmony with all its surroundings, it antagonizes nothing but error, it is in perfect accord with every other truth, while falsehood comes in conflict with everything that is true and is inconsistent with itself. A fair, square transaction is always susceptible of satisfactory explanation; indeed, as a rule it needs no explanation. There were evidently large sums of money taken in by the firm shortly before the assignment which were never accounted for and which could only be accounted for by the Pragers, Keller, and Katzenstein, or some of them, and why they failed to appear as witnesses can only be explained on one theory, and that is, that they were each and every one unable to make an explanation of their transactions consistent with the truth and show that they were free from the fraud and conspiracy charged in the bill and of which there was so much convincing proof. In *Hefflebower* v. *Detrick*, 27 W. Va. 17, Syl. 8, it is held: "No rule of law is better settled than that a party having it in his power to prove a fact, if it exist, which, if proven, would benefit him, his failure to prove it must be taken as conclusive that the fact does not exist." *Wells-Stone Mercantile Co.* v. *Truax*, 44 W. Va. 531; *Union Trust Co.* v. *McClellan*, 40 W. Va. 405. The bill and amended and supplemental bill charge conspiracy and fraud in very unequivocal terms against the defendants, Isaac Prager & Son, Henry Keller, trustee, and Julius Katzenstein, and there are many facts and circumstances and much evidence tending to show the truth of the allegations of the bill, much more than sufficient to remove the presumption of innocence, indeed, almost sufficient

to convict in case of a criminal prosecution, and yet, not one of them would appear as a witness to explain the circumstances and facts tending so strongly to support the allegations of fraud and conspiracy.

It is charged by plaintiffs that the claim of Katzenstein against the Pragers was fictitious as to a large part thereof, and this is borne out by the action of Katzenstein himself. When he sued out his attachment on the 29th of December, 1896, he filed his affidavit, in which he says: "That the amount, at the least, which affiant believes he is entitled to recover in said action is the sum of forty-one thousand nine hundred and eighty-six dollars." He afterward, on the 17th day of February, 1897, took judgment by default for the sum of thirty-seven thousand nine hundred and eighty-three dollars and eight cents. It is hardly probable that four thousand dollars of his debt had been paid in the meantime. Why he should make this abatement is not explained. He could just as well have taken his judgment for the amount claimed in his affidavit for attachment, as the defendants entered no appearance and made no defense. And there was other evidence tending to show the fictitiousness of the claim of Katzenstein.

It is complained that the court erred in considering on the hearing of the cause the illegal evidence of plaintiff, including the exhibits therewith and particularly the exhibits of testimony taken in other causes to which appellant and many of the other parties to this suit were not parties. The court did not pass upon appellant's objections and exceptions thereto and it does not appear that the court considered at the hearing any of such testimony which was illegal, and it is presumed to have ruled out all which was illegal or improper to be considered, especially as the decree is so thoroughly supported by the facts and circumstances and by the evidence, which is unquestioned. "When a case is tried by the court in lieu of a jury, it is not error in the court to hear illegal testimony, the court being fully competent to discard the illegal evidence." *Wells-Stone Mercantile Co.* v. *Truax,* cited; *Mutter* v. *Sydenstricker,* 11 W. Va. 535; *State for use of Crumbacker* v. *Seabright,* 15 W. Va. 590; *Abrahams* v. *Swann,* 18 W. Va. 274. There being no reversible error the decrees complained of are affirmed.

*Affirmed.*