# CHARLESTON.

THE CITIZENS BANK OF WESTON *et als. v.* WILFONG *et als.*

*Submitted February 23, 1909.    Decided December 14, 1909.

1.  FRAUDULENT CONVEYANCES—*Transfer to Volunteer—Rights.*
    A volunteer, claiming under a party to an actually fraudulent conveyance, is not protected.    (p. 473).

2.  SAME—*Purchase by Husband—Conveyance to Wife.*
    If a husband purchase land, with intent to defraud creditors of the vendor, and cause it to be conveyed to his wife, she pay-

ing nothing for it, the creditors of the grantor may set aside the deed and charge the land to the extent of their debts.  (p. 473).

3.  SAME—*Purchase by Husband—Conveyance to Wife—Husbands Creditors.*

In such case, the conveyance could be successfully assailed, as being conclusively fraudulent, by the creditors of the husband, existing at the time of the purchase.  (p. 473)..

4.  SAME—*Badges of· Fraud—Evidence—Weight.*

In the law of fraudulent conveyances, mere badges of fraud, such as fraudulent acts in respect to property other than that involved in the suit and subsequent in time to the conveyance, assailed, relationship of the parties, their prior and subsequent association in business, incurrence of large subsequent indebted·ness, are, in themselves, only circumstances, raising slight in·inferences of actual fraud, and insufficient to overthrow a deed when negatived by well established facts and circumstances clearly inconsistent therewith.  (pp. 474-479).

Appeal from Circuit Court, Braxton County.

Suits by Hyer & Hyer, by the Citizens' Bank of Weston, and by Mary E. Wilson, against S. L. Wilfong and others.  From decrees in favor of complainants, defendants S. L. Wilfong, Daniel Wilfong, and Virginia Belle Wilfong appeal.

*Reversed.  Dismissed in part.  Remanded.*

*Hall Bros.,* for appellants.

*Alex Dulin, W. W. Brannon,* and *Morrison & Rider,* for appellee, Citizens' Bank of Weston.

POFFENBARGER, JUDGE:

Assigning twenty errors in decrees, made and entered in three consolidated chancery causes, S. L. Wilfong, Daniel Wilfong and Virginia Belle Wilfong have appealed therefrom.  The suits were brought in Braxton county, one by the firm of Hyer and Hyer, assignees, in June, 1904, to enforce a vendor's lien, reserved in a deed from Miles Simmons to S. L. Wilfong, conveying to the latter a tract of land, containing 457.25 acres; another by the Citizens Bank of Weston, in February, 1905, to set aside, as voluntary and fraudulent, a deed from S. L. Wilfong, conveying said tract of land to Virginia Belle Wilfong, the wife of Daniel Wilfong; and the third by Mary E. Wilson,

to enforce a judgment lien on land and other property. In said second suit, after the entry of a decree, setting aside the deed, A. J. Wilfong and others, as creditors, filed a petition, upon which they were made parties, attacking the conveyance as fraudulent. The liens in favor of Hyer and Hyer and Mary E. Wilson are undisputed, but there is controversy as to whether Daniel Wilfong is liable for the debt, due the Citizens Bank of Weston, the note, held by it at the date of the institution of the suit, having been executed by S. L. Wilfong as principal and Chas. B. Goodwin, D. L. Smith and A. G. Gould as sureties. By an amended bill, however, it is alleged to have been executed for a balance due on a debt of S. L. Wilfong and Daniel Wilfong and not to have been accepted as payment of the same. To this the defendants reply that Daniel Wilfong was only a surety or endorser in the original debt and was released by an extension of time, effected by the taking of the new note without his consent. This alleged release is set up on the theory of a purchase of the land, in good faith, for an adequate consideration, from S. L. Wilfong, by Daniel Wilfong for Virginia Belle Wilfong, wife of the latter, which could not be disturbed by anybody other than a creditor of said Daniel. To the bill and amended bill of the Citizens Bank and petitions, alleging fraud in the conveyance, S. L., Daniel and Virginia Belle Wilfong made full defenses by demurrers and answers. The causes were all consolidated, and, on consideration of a great volume of depositions and documentary evidence, consisting, in part, of the records of another suit in which a fraudulent transfer of personal property from S. L. Wilfong to G. B. Talbott, with which Daniel Wilfong had some connection, a final decree was made on the 11th day of December, 1906, setting aside said deed as to all the assailing creditors, fixing the amounts and priorities of the debts as liens on the land, and ordering the sale of all the lands in default of payment.

If the conveyance in question was fraudulent as to the creditors of S. L. Wilfong, it is wholly immaterial whether Daniel Wilfong remained bound for the debt of the Citizens Bank. Even though he paid a valuable consideration for the land conveyed to his wife by S. L. Wilfong, that fact avails him nothing, if he did it in fraud of the rights of the creditors of the

latter. *Bank* v. *Prager,* 50 W. Va. 660; *Lewis* v. *Bragg,* 47
W. Va. 707; *Bartlett* v. *Cleavenger,* 35 W. Va. 719; *Silverman*
v. *Greaser,* 27 W. Va. 550; *Bowyer* v. *Martin, Id.* 442; *Livesay*
v. *Beard,* 22 W. Va. 585; *Harden* v. *Wagner, Id.* 356; *Goshorn*
v. *Snodgrass,* 17 W. Va. 717. Do the facts, that the purchase
money was paid by the husband and the conveyance taken in
the name of the wife, make any difference, the debt sued on
being that of the grantor? We think not. As between the
wife and a creditor of the husband, the conveyance, being volun-
tary, is conclusively fraudulent. In the case supposed, there
is a voidable contract between the vendor and purchaser, the
grantor and purchaser, and, because of their fraudulent intent,
the creditor of the former may impeach it. On the establish-
ment of the fraud, the wife, being unable to establish a *bona
fide* purchase for value by her without notice, since she is a
mere volunteer, paying nothing, can not hold the land. Ap-
plication of this general principle to cases of this class will be
found in *Root-Tea-Na-Herb Co.* v. *Rightmire,* 48 W. Va. 222;
*Blackshire* v. *Petit,* 35 W. Va. 547, and *Goshorn* v. *Snodgrass,*
17 W. Va. 717. Cases directly in point and denying claims of
mere volunteers are *Snoddy* v. *Haskins,* 12 Grat. 363, and
*Williamson's Ex'r* v. *Goodwyn,* 9 Grat. 503.

If, however, Daniel Wilfong is liable for the debt due the
Citizens Bank of Weston, as a maker of, or a surety in, the
note originally given for it, according to the theory of the
amended bill, the voluntary conveyance made to his wife, pur-
suant to his alleged purchase of the land, could not stand.
The bank could set it aside as being conclusively fraudulent
as to it. But these allegations of the amended bill are all
squarely and flatly denied by the answers of the defendants
and no proof to sustain them has been pointed out in the brief
or found by us in our examination of the record. It is morally
certain, from admissions in the bill, that no credit was given
to Daniel Wilfong otherwise than as endorser of the note.
It is admitted that S. L. Wilfong was the maker, and Daniel
the endorser, and claimed that the note was several times re-
newed and then that somebody else was substituted for Daniel
as an endorser. There is no evidence at all of protest and notice
thereof, or waiver of protest. It is then alleged that plaintiff

is informed and believes that Daniel was a beneficiary of the loan or used part of the money. All of this is denied and there is not a word of proof to sustain it. No witness testifies as to the exact date of the loan or as to who got the money or how it was expended.

It follows that the great inquiry in the case is, whether the object and purpose of this conveyance was to hinder, delay and defraud the creditors of S. L. Wilfong, whether he had such fraudulent intent and Daniel Wilfong had knowledge thereof and participated therein. To sustain this charge, plaintiffs rely mainly upon circumstances, indicative of fraud, sometimes designated in the law books as badges thereof. As summarized in their brief, these are (1) the relationship of the parties, (2) the grantor's insolvency, (3) pursuit of him by his creditors at the time, (4) an alleged fraudulent conveyance of personal property by Samuel Wilfong to Daniel, somewhat remote in time from the date of the conveyance to Daniel's wife, (5) alleged want of consideration, (6) retention of possession of the property by the grantor, and (7) alleged fraudulent incurrence of indebtedness after the conveyance. The history and situation of the parties and circumstances involved are substantially as follows:

Originally, all the Wilfongs, the father and mother, Jesse and Martha, the defendants S. L. and Daniel, and their brothers, A. J. and A. F., had resided in Lewis county. The father, apparently a man of some substance, had divided his estate among his children, conveying to them certain tracts of land and retaining a lien for the support of himself and his wife. About the year 1900, Samuel sold his farm in Lewis county to H. W. Galford for $2,892.00, receiving $1,000.00 in cash and two notes for $946.00 each, due, respectively, in about one and two years after date. One of these notes he assigned to his father. With this money and possibly something in addition, he went to Braxton county and bought the tract of land in controversy, containing 457.25 acres, from Miles Simmons, agreeing to pay him $4,300.00 therefor and paying $2,000.00 of it in cash and executing his three notes for the residue, two for $1,000.00 each and one for $300.00, which were secured by a vendor's lien. On the 10th day of January, 1903, he and his wife conveyed this land to Virginia Belle Wilfong, the wife of

Daniel Wilfong, by a deed, reciting a consideration of $5,715.63 and acknowledging the receipt of $4,117.43 thereof, and a note for the residue, $1,598.20, payable in ten months, and executed by Virginia Belle Wilfong and Daniel Wilfong. This conveyance was made in pursuance of a contract of sale, dated April 27, 1902, fixing the price of the land at $15.00 per acre and specifying November 1, 1902, as the date on which the conveyance should be made. On the back of this contract, there is an endorsement of the receipt of $255.00 as part payment, dated May 26, 1902. Within a very short time thereafter, S. L. Wilfong purchased, at a judicial sale, certain lands known as the "Rollyson Lands," for which he obligated himself to pay $4,774.00, represented by three notes for $1,591.33⅓ each, due in six, eight and twelve months, respectively, and all bearing date on the first day of May, 1902. It will be observed that this purchase of the Rollyson lands was almost simultaneous with the contract for the sale of the Simmons land, afterwards carried into deed. At this time, there was a balance of purchase money due on the Simmons land, amounting to $2,300.00 and nothing was paid on the Rollyson lands. The contract of sale of the Simmons land was by the acre, and, the quantity not being known, a survey was necessary. This survey seems not to have been made until a short time before the execution of the deed, not in time to enable the parties to execute the deed on the first of November, 1902, the date for the conveyance, specified in the contract. In the meantime, it became necessary to make payment of some of the purchase money of the Simmons land and also of the Rollyson lands. The evidence establishes, beyond the possibility of doubt, that, within this time, or shortly afterwards, $2,000.00 was paid on the Simmons land and over $2,000.00 on the Rollyson lands. One of the purchase money notes for the Rollyson lands, $1,591.33⅓, and the interest thereon, was paid and a credit of $550.33 is endorsed on the second note as of June 22, 1903. One of the Simmons land purchase notes, $1,000.00 and interest, was taken up with money obtained from Galford. It seems that when the first Galford note was due in the hands of Jesse Wilfong, by assignment, the second note was substituted for it and the money paid by Galford went to S L. Wilfong, by whom this first Miles Simmons note was paid.

There was no more money due from Galford. It is claimed that Daniel Wilfong paid the second Simmons note of $1,000.00. In order to carry out this arrangement, Daniel Wilfong borrowed of one A. A. Rohrbough $3,000.00, which he secured by a deed of trust on his lands in Lewis county. He and all of his brothers, herein mentioned, seem to have been engaged in cattle dealings and other enterprises and, in some of these, they were jointly interested, and part of the money, claimed to have been used in the purchase by Daniel Wilfong of the land in question, is said to have been derived from the sale of cattle, hay and other products. When the deed for the Simmons land was made to his wife, a memorandum is said to have been made, showing the items that went into what was treated as the cash payment of $4,117.43. That includes the Simmons note for $1,000.00 and $125.00 interest, cash paid to S. L. Wilfong $1,500.00 and $7.50 interest, Samuel Wilfong's note to Daniel Wilfong $214.00 and $12.84 interest, Samuel Wilfong's note to Daniel Wilfong and brothers $170.00 and $40.80 interest, cash from Daniel Wilfong $600.00, cash from Daniel Wilfong $255.00 and $8.89 interest, paid Jesse Wilfong for Samuel Wilfong $12.90, same $100.00 and $14.00 interest, same $50.50 and $6.00 interest. The allowance of interest is explained and justified on the ground that some of these notes and payments bore date long before the contract of sale was made and others between the date of the contract and the date of the deed, and it was contemplated that possession of the land should not be yielded to Daniel Wilfong and his wife until after conveyance by deed. In other words, as Samuel retained possession of the land until conveyed, he should pay interest on the purchase money received before deed made, a reasonable and equitable theory. The evidence seems to establish the fact that Daniel Wilfong paid off the second Miles Simmons land purchase note. He and his brother are corroborated also in the statement that he paid the $600.00, by the testimony of another witness. A witness also sustains them in saying that the $1,500.00 was paid. Almost immediately after it is said this money was paid, S. L. Wilfong took up his first note given for the purchase money of the Rollyson lands. There is no confirmation of the claim of the payment of the $255.00 except the endorsement of the receipt thereof on

the contract. The contention in the brief of counsel for the appellee is, that Daniel Wilfong was wholly unable to pay all the money he claims to have paid, and that it is conclusively shown there were no transactions between him and S. L. Wilfong, out of which any of the indebtedness, such as is said to have been settled in this conveyance, could have arisen. For proof of this last claim, reference is made to the testimony of Lora B. Wilfong, the wife of Samuel, who has left him and is now living with her father, and testified in favor of the plaintiff. We are of the opinion that her evidence is not sufficient to establish all that is claimed for it. She simply said she had access to Samuel L. Wilfong's desk in which he kept his notes and papers, and sometimes his money, and that she sometimes went over his papers and examined them with him and acted, on occasions, as his amenuensis, and that she had no recollection of having seen some of the papers This does not establish the lack of any business relations and transactions between the two brothers. According to her testimony, no cash ever passed between them or was paid by one for the other, though it is clear beyond question or doubt that Daniel Wilfong took up the Simmons note and it is almost absolutely certain that he made the two payments of $1,500.00 and $600.00. If Daniel held evidences of debt against S. L. Wilfong, as both say he did, it is not likely they would be found in S. L. Wilfong's desk until after the surrender thereof, and even then, they may never have been put in there. Evidently, less attention would be paid to them and less care taken for their preservation after liquidation and settlement thereof. S. L. Wilfong does not admit that he owed Daniel nothing. On the contrary, he insists that he owed him all that is alleged to have been settled on the land purchase and much more. Stress is laid, however, in this connection, upon an admission made by him that certain transfers of personal property were made to his father-in-law, G. B. Talbott, the father of the witness, Lora B. Wilfong, and by reason of his suretyship for S. L. Wilfong for debts due Mary E. Wilson, Robert Samples and perhaps others, interested in the maintenance of the claims of these creditors, was made for the purpose of delaying his creditors, in order to secure the best possible disposition of his property and prices there-

for, as well as to gain time. There were other transfers of personal property made to his brother Daniel, involved in some subsequent litigation between him and Samuel and Talbott and other creditors of Samuel. Whatever may be said of the effect of this admission in some other connections, it does not say there was no indebtedness due from him to Daniel Wilfong. The evidence makes it reasonably certain that, during the period of the transactions involved, Daniel Wilfong borrowed of Henry Siron $1,000.00, collected from one Reeder for cattle, $128.00, from Judge W. G. Bennett for hay $115.00, from another Reeder for cattle $400.00, from Lloyd and Taylor Hefner for cattle over $2,000.00, from one Boggs, for horses, $350.00, and borrowed from Mary E. Wilson $700.00, from Susan Depoy $600.00, Duncan McQuain $400.00. This, in addition to the money he borrowed from Rohrbough, $3000.00, makes a sum sufficient to pay all that he claims to have paid to and for his brother and considerably more. It may be that Samuel Wilfong was insolvent at the time or soon afterwards, but he handled very considerable sums of money and seems to have derived, from various sources, the following amounts: sale of his land to Galford $2,892.00, loan from the Citizens Bank of Weston, $1,000.00, loan from the First National Bank of Sutton over $1,600.00, loan from H. H. Rittenhouse over $1,000.00, loan from the Traders National Bank of Buckhannon $200.00, timber contract with David Evans $500.00, loan from Jesse Wilfong $200.00, and a loan from Robert Samples of $300.00. There are a number of judgments against him, amounting to over $2,000.00, some of which probably represent borrowed money. He paid, on account of the Simmons land $3,000.00, on account of the purchase money of the Rollyson lands $2,142.06, for improvements on the Rollyson lands, according to his testimony, about $2,400.00, to the Citizens Bank of Weston $500.00, on account of Stover land $275.25. In the purchase of the Rollyson lands, W. K. Bender was associated with him. He bought Bender out, paying him $800.00 for his interest. It seems clear, therefore, that he paid out fully as much or more than all the money received by him, including that which Daniel Wilfong claims to have paid him.

Notwithstanding the relationship subsisting between the parties, which does not raise a presumption of fraud, but merely calls for a closer scrutiny into their transactions by the court, when fraud is alleged respecting the same, and somewhat reduces the measure of proof resting upon the attacking creditor, force and effect must be given to these facts and circumstances. The relationship does not destroy them. They cannot be brushed out of view simply because the parties are related. In many instances in which transactions of this kind are assailed as having been fraudulent, the evidence fails to disclose any proper motive or purpose in the parties. The debtor disposes of his property by conveyance to a relative, receiving, or claiming to have received, payment in cash or satisfaction of antecedent indebtedness, and has no property left and is unable to show what disposition was made of the money he claims to have received. In such cases, the fact of relationship may well be said to be a potent circumstance. A debtor, seeing no means of escape from his difficulties, has a strong motive for shifting all his property into the hands of a close relative upon a secret trust for his own benefit. His inability to state any other plausible motive for the conveyance and the facts that he has nothing to show for it and his creditors have nothing to resort to for satisfaction of their debts, operate very strongly to establish the fraud. The evidence in this case, so far as it has been considered, shows a different situation. While Samuel Wilfong disposed of his property to his brother, the fact of the payment of a considerable amount of money, by far the larger portion of what is claimed to have been paid by way of consideration, is put beyond reasonable doubt, and this money is accounted for in the purchase and improvement of another tract of land by the grantor. While putting one tract of land beyond the reach of creditors, as regards legal remedy, he acquired another to which his creditors might resort. Whether he thereby rendered himself insolvent is, at least, a doubtful question. Many of the debts he owes were contracted long after the conveyance complained of. If the case stood merely upon this evidence, we should be compelled to say the charge of fraud is not established. Apparently, this is the view of counsel for the appellee, for they rely, as we have indicated, not so much upon the direct evidence of actual fraud,

as upon what are called badges of fraud and inferences arising, not from the immediate transactions, but from others collateral thereto and bearing some sort of relation to it.

Relationship, as we have shown, is not conclusive. As much of the indebtedness seems to have been contracted long after the transaction in question here, and Samuel Wilfong was engaged in various business enterprises, requiring the use of considerable sums of money, it is by no means clear that his financial difficulties and trouble with his creditors did not arise after the conveyance rather than coincidently therewith. This conveyance was made in January, 1903, in pursuance of a contract made in April, 1902. The earliest judgments disclosed against him were taken in 1904, considerably more than a year after the conveyance, and more than two years after the date of the contract and the purchase of the Rollyson lands Even then, his heavier creditors do not seem to have proceeded. The judgments were taken, for the most part, before justices of the peace on small claims. This suit was not instituted until February, 1905. The suit of *Daniel Wilfong* v. *G. B. Talbott* was not brought until in November, 1904. Morrison and Rider, Commissioners, did not sue to enforce the payment of the balance of the purchase money of the Rollyson lands until July, 1904, nor file their bill until September, 1904. In the meantime, S. L. Wilfong was engaged in cutting and marketing the timber on the Rollyson lands which was interrupted by the activity of his creditors. He claims also to have cleared about 45 acres of the land at a cost of more than $2,000.00 and to have improved the land otherwise. The fact of improvement is not denied so far as we are able to discover, nor is the witness's estimate or statement of the cost thereof. It is highly probable that considerable money was thus expended and many debts created. These facts bear upon the good faith of the transaction between him and his brother and also upon the question of his solvency at the time of the conveyance. Besides having incurred subsequent indebtedness in the improvement of the Rollyson lands, he bought out Bender at a cost of $800.00. All this money must have come from some source, and it must be said that S. L. Wilfong was doing something other than creating debts. These facts and circumstances negative the contention that, after the conveyance of the Sim-

mons land, his principal business was the contracting of debts. He did contract debts, many of them, and some large ones, but he was expending the money, most of it, as shown by the testimony and the circumstances, unwisely, and making his condition worse instead of better, but, nevertheless, parting with the money. Is there anything in the evidence tending, with any degree of certainty, to show that Daniel Wilfong was obtaining this money while his brother was contracting the debts? The circumstances all indicate the contrary and the contention rests upon nothing, so far as we can see, but mere suspicion. This is not one of those cases in which the debtor, making a conveyance to a relative, suddenly drops out of business with all his property out of the reach of his creditors, and is unable to give any reasonable account of the transaction, the purpose for which the conveyance was made, or the disposition of the proceeds of the sale.

The record of the suit of *Daniel Wilfong* v. *Talbott* and others discloses purpose and intent, on the part of Daniel Wilfong and S. L. Wilfong to obstruct creditors in respect to their remedies against S. L. Wilfong. In the month of June, 1904, more than two years after the contract of sale of the Simmons place was made and almost eighteen months after that contract was executed by a conveyance, S. L. Wilfong transferred certain personal property to Daniel Wilfong and certain other property to G. B. Talbott, his father-in-law, and a later contract was made in September, 1904, in an attempt to strengthen the position of Talbott, in respect to this property. Daniel Wilfong's claim to the personal property so transferred to him was defeated in proceedings at law by the creditors of S. L. Wilfong. He was a creditor of S. L. Wilfong, for the record in the suit brought by him against Talbott, to set aside the transfer made by S. L. Wilfong to Talbott, showed a debt due him from S. L. Wilfong of $529.62 and decrees it as a lien upon the Rollyson lands, having precedence over certain other debts, among which is that of G. B. Talbott, his adversary in that suit, as well as in this. Moreover, that decree contains this recital: "The debt of Daniel Wilfong in so far as it is represented by the judgments of G. M. Gerwig & Co. of $192.72; Aaron Gerwig, Administrator, of $337.00; Henry Bender $25.28; W. K. Bender $67.61; W. H. Lee $14.82; The Sutton Bank $166.95; The Sutton Bank $78.61,

and J. C. Johnson $66.95; aggregating $912.95." It also appears from that record that said Talbott was a surety of S. L. Wilfong in several debts and that the transfers and conveyances were made to him in part, at least, to protect him as a creditor. He admits that his purpose was to delay his creditors, but Daniel Wilfong's inability to hold this property, accompanied by the fact that he was a creditor in the sum of nearly $1,500.00, may justly be regarded on his part as an attempt rather to obtain preference than to defraud his creditors. To show bad faith in the transfer to Daniel Wilfong, testimony of said Talbott and his daughter, Lora B. Wilfong, to conversations between Samuel and Daniel, was introduced. It was to the effect that Daniel said he thought he could hold the teams and let Samuel use them, but, as the latter was getting deeper in debt, the former threatened to sell them, and Samuel denied his right and power to do so. Neither of these witnesses, however, say Daniel acquiesced in this protest of his brother or admitted lack of *bona fide* consideration for the transfer. Similarly, it is urged that two alleged notes, one for $219.50, dated Aug. 5, 1904, and the other for $140.00, dated Nov. 4, 1904, both executed by S. L. Wilfong and payable to Daniel Wilfong, prove attempted fraudulent obstruction of creditors. That they were fabricated and not genuine is said to be indicated by the fact that, although of different dates, they were probably written at the same time, on the same sheet of paper and then torn apart. But even though this transfer be regarded as fraudulent, on the part of both brothers, it was subsequent and may very well be attributed to complications and embarassment which arose long after the conveyance of the Simmons land, and the two notes, if fraudulent, were incidents of the same subsequent transaction. While a subsequent act of fraud between the grantor and the grantee, relating even to different property, may be evidence of fraud raising an inference thereof, it certainly does no more than raise a mere inference, and, if this be negatived by circumstances attending the subsequent transaction, as we think it is in this case, it is clearly insufficient to sustain the charge of fraud in the antecedent transaction. All the facts and circumstances indicate that these two men, after the conveyance, continued to transact business, engaged in numerous enterprises, contracting

new indebtedness, buying additional property and creating new conditions, eventuating in financial difficulties and embarrassment, likely not anticipated at all at the time the conveyance was made. So we think this badge of fraud, if it be regarded as such, is not sufficient to overthrow the deed.

Certain other fraudulent acts, on the part of Samuel Wilfong, to which Daniel is not shown to have been a party, are relied upon. On the faith of the note for $1,598.20, executed to him by Daniel and Virginia Belle Wilfong, he is said to have obtained three loans, one from H. H. Rittenhouse of $1,000.00, one from the Citizens Bank of Weston for $1,000.00 and one from the First National Bank of Sutton for $1,645.64, in the following manner: He exhibited it, together with the Evans timber contract, to his two brothers and thereby induced them to become his sureties to Rittenhouse. He exhibited it to certain other persons, whom he requested to endorse for him to the Citizens Bank of Weston, promising to pledge it to the bank as collateral for the loan, and thereby induced them to indorse for him. Later, he obtained the loan from the Sutton Bank, actually using it there as collateral. A. J. Wilfong says the note exhibited to him was a note for $1,600.00, executed by Daniel Wilfong alone, and purporting to be for land. Some of the parties who endorsed the Citizens Bank note also say the note exhibited to them was for $1,600.00. These witnesses are all depending upon their recollections of a paper momentarily exhibited to them two or three years before their testimony was taken. As the note shown to have been in existence at the time was only $1.80 short of $1,600.00, it was most natural to call it a $1,600.00 note. Likely these men, having confidence in Wilfong, and relying upon him, merely glanced at the note, called a $1,600.00 note, and thereafter had the impression that it was of that amount. No $1,600.00 note is shown to have been in existence, otherwise than by the testimony of these witnesses, and, if there was one, it is not shown that Daniel Wilfong executed or knew anything about it. Both he and his brother deny that there ever was such a note, and the latter that any such note was exhibited. There was then a note for $1,598.20 in S. L. Wilfong's hands. It had not yet been delivered to the Sutton Bank. We think it almost certain this was the note exhibited. That Wilfong prom-

ised to deposit it as collateral with the Citizens Bank and failed
to do so is clearly established, but it is not shown that Daniel
had anything to do with this or knew of it, and all this was
subsequent to the contract of sale and the conveyance. It is
also charged that Daniel Wilfong forged the signatures of his
two brothers to a note for $1,378.00, dated March 15, 1902, and
payable to W. R. Jewell. The charge of forgery cannot be said
to be established. The signatures are not in the handwriting
of A. J. and A. F. Wilfong and are in the handwriting of Daniel
Wilfong. This is not denied, but Daniel Wilfong swears his
two brothers authorized him to sign their names. It is also un-
doubtedly true that, on former occasions, these men had been
associated as partners in buying and selling stock and in the
habit of signing each other's names to commercial paper. This
relationship and practice was admitted by A. J. and A. F.
Wilfong, but they say it had ceased at the time of the date of
this note. This claim is not made clear by any means. On
the contrary, it seems very probable that their friendship and
business association continued down to the date of this note
and afterwards. This note is a renewal of one for $1,300.00,
dated sometime in 1901. Both the evidence of prior transac-
tions and of conduct after suit on the renewal note make it
extremely doubtful whether there was a forgery and the suit
on the note to hold these parties is still pending. Without
deciding whether there was or not, we say that, in this state
of the evidence, we cannot establish it and then raise an in-
ference upon it for the purpose of impeaching the deed. We
think this circumstance must be eliminated, and that the other,
in which the alleged $1,600.00 note figured, is of itself, and as
aided by the other circumstances relied upon, insufficient to
overthrow the deed.

The contention that the conveyance was without considera-
tion is overwhelmingly refuted by the evidence. Retention of
possession is not established. On the contrary, Daniel Wilfong
and his wife took possession of the land immediately after the
conveyance. Although S. L. Wilfong resided upon the land,
and, after his wife left him, made his home with his brother,
his possession, if any he had, was not exclusive. There is no
evidence tending to show that, after the conveyance, he exer-

cised, or attempted to exercise, any exclusive dominion over the property, or treated it as his own in any respect.

Our conclusion is that the decree complained of, in so far as it declares this conveyance fraudulent and sets it aside and adjudicates and establishes liens thereon and gives priority, on the theory of fraud in the conveyance, must be reversed and the bill of the Citizens Bank of Weston dismissed.

In the other suits, those of Mary E. Wilson against Daniel Wilfong and others and Hyer and Hyer against S. L. Wilfong, *et als,* as well as in this one, a number of liens by judgment, reservations in deeds, deeds of trust and otherwise are involved. The conclusion here announced will necessitate a radical readjustment and rearrangement of these liens. The suit of the Citizens Bank of Weston and the grounds upon which it is based are wholly eliminated as to it, A. J. and A. F. Wilfong and all others who have herein assailed the deed on the ground of fraud. The error, in sustaining the bill of the Citizens Bank and holding the deed fraudulent, has been carried into the commissioner's report and the final decree. While the liens in favor of Mary E. Wilson, Mary M. Warren, A. A. Rohrbough, Susan Depoy and others, established independently of the allegations of fraud, are all valid and ought to be enforced, this decree for the sale of the land of Daniel Wilfong and Virginia Belle Wilfong, carries relief to the Citizens Bank of Weston on its bill. It also adjudicates, as liens upon the 457.25 acres of land, judgments against S. L. Wilfong, and not against Virginia Belle Wilfong or Daniel Wilfong, recovered long after the conveyance of this tract of land. Of course it cannot be subjected to the payment of these judgments. It is unncessary to take time and space here to eliminate the erroneous allowances from this decree and restate and fix the amounts and priorities of those that ought to be enforced. For this purpose, the cause ought to go back to the circuit court and possibly be again referred to a commissioner.

As there appears to have been a decree for the sale of the Lewis county land, in the suit of Jesse Wilfong and others against Daniel Wilfong, pending in said county, or at least that a decree for the sale thereof will be made in said suit, it is gravely doubtful whether any decree for the sale of that land

ought to be made in this suit, until one suit or the other has been transferred and the causes consolidated. This seems not to have been done. We find nothing in the record here concerning the Lewis county suit except the allegations of its pendency in the answer of Jesse Wilfong and Martha J. Wilfong to the amended bill of the Citizens Bank of Weston. They insist that the pendency of their suit in Lewis county shall not be interferred with to their prejudice in this suit. The Lewis county suit was instituted on the 28th day of March, 1905. The process on the amended bill in this suit is dated April 25, 1905, and process on the original bill in this cause, on the 11th day of Feb., 1905, and Jesse and Martha Wilfong were not made parties to the original bill. In the commissioner's report ,there is filed a copy of the decree in the Lewis county suit, declaring liens in favor of Jesse and Martha Wilfong and Rohrbough, and referring the cause to a commissioner to ascertain the probable amount it will require for the care and maintenance of the plaintiffs and the extent to which they are entitled to a lien on the land therefor.

For the reasons stated, the decree complained of will be wholly reversed, the bill of the Citizens Bank of Weston and the petitions and answers of other creditors filed herein, assailing the deed to Virginia Belle Wilfong, as having been made with intent to defraud the creditors of S. L. Wilfong, will be dismised and the other causes remanded to the circuit court of Braxton county, for further proceedings to be had therein in accordance with the principles and conclusions here announced, and further according to the rules and principles governing courts of equity.

*Reversed. Dismissed in part. Remanded.*